### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | Case Number: 17-50070 |
| | ) | |
| v. | ) | |
| | ) | |
| MARIA ISABEL MOLINA-ISIDORO, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| _____ | ) | |

### MOTION FOR LEAVE TO FILE OUT OF TIME
### BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION, ASIAN AMERICANS ADVANCING JUSTICE-ASIAN LAW CAUCUS, COUNCIL ON AMERICAN-ISLAMIC RELATIONS (CAIR), CAIR CALIFORNIA, CAIR FLORIDA, CAIR NEW YORK, CAIR OHIO, AND THE NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS IN SUPPORT OF DEFENDANT-APPELLANT

COMES NOW lead counsel for Electronic Frontier Foundation, Asian Americans Advancing Justice-Asian Law Caucus, Council on American-Islamic Relations (CAIR), CAIR California, CAIR Florida, CAIR, New York, CAIR Ohio, and the National Association of Criminal Defense Lawyers (hereinafter "Amici") to respectfully move for leave to file out of time the attached amicus curiae brief (Exhibit 1) in support of defendant-appellant pursuant to Fed. R. App. P. 29(a)(6). In support thereof, Amici state as follows:

1.      Amici have received consent from the defendant-appellant, and the government is not opposed to the filing of this brief.

2.      Amici have attempted on two prior occasions (August 7 and August 28) to file this brief. *See* Exhibits 2 and 3.

3.      Amici apologize to the Court for not timely filing their brief. Given the multiple recent changes to the calendar, Amici humbly request that the Court will grant the motion to file this brief out of time.

WHEREFORE, Amici respectfully request that the Court grant that their Motion to File Out of Time and accept for filing the amicus curiae brief attached as Exhibit 1.

Dated: August 29, 2017

Respectfully submitted,

/s/ *Mitchell L. Stoltz*
Mitchell L. Stoltz
    *Counsel of Record*
Sophia Cope
Adam Schwartz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
(415) 436-9333
mitch@eff.org

*Counsel for Amici Curiae*
*EFF, AAAJ-ALC, CAIR,*
*and four CAIR Chapters*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeal for the Fifth Circuit by using the appellate CM/ECF System on August 29, 2017. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  August 29, 2017                /s/ *Mitchell L. Stoltz*
                                          Mitchell L. Stoltz

**Exhibit 1**

Case No. 17-50070

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MARIA ISABEL MOLINA-ISIDORO,

*Defendant-Appellant.*

_____

**BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION, ASIAN AMERICANS ADVANCING JUSTICE-ASIAN LAW CAUCUS, COUNCIL ON AMERICAN-ISLAMIC RELATIONS (CAIR), CAIR CALIFORNIA, CAIR FLORIDA, CAIR NEW YORK, CAIR OHIO, AND THE NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS IN SUPPORT OF DEFENDANT-APPELLANT**

_____

On Appeal from the U.S. District Court for the Western District of Texas, El Paso
The Honorable Philip R. Martinez, U.S. District Court Judge
Case No. 3:16-cr-1402-1

_____

Mitchell L. Stoltz
  *Counsel of Record*
Sophia Cope
Adam Schwartz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
(415) 436-9333
mitch@eff.org

*Counsel for Amici Curiae
EFF, AAAJ-ALC, CAIR,
and four CAIR Chapters*

Nicole DeBorde
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
712 Main Street, Suite 2400
Houston, TX 77002
(713) 526-6300

*Counsel for Amicus Curiae
National Association of Criminal
Defense Lawyers*

*(Additional counsel listed inside cover)*

Cynthia Orr
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
Goldstein, Goldstein, Hilly & Orr
310 S. St. Mary's Street
29th Floor Tower Life Building
San Antonio, TX 78205
(210) 226-1463

*Counsel for Amicus Curiae National
Association of Criminal Defense
Lawyers*

Michelle Simpson Tuegel
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
Hunt & Tuegel PLLC
ALICO Building, Suite 1208
425 Austin Avenue
Waco, TX 76703
(254) 753-3738

*Counsel for Amicus Curiae National
Association of Criminal Defense
Lawyers*

## <u>SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES</u>

Pursuant to this Court's Rule 29.2, the undersigned counsel of record for *amici curiae* certify that the following additional persons and entities have an interest in the outcome of this case.

1. Electronic Frontier Foundation, Asian Americans Advancing Justice-Asian Law Caucus, Council on American-Islamic Relations (CAIR), Council on American-Islamic Relations California, CAIR Florida, Inc., Council on American-Islamic Relations New York, Inc., Council on American-Islamic Relations Ohio, and The National Association of Criminal Defense Lawyers, *amici curiae.  Amici curiae* are nonprofit organization recognized as tax exempt under Internal Revenue Code § 501(c)(3).   They have no parent corporation and no publicly held corporation owns 10 percent or more of their stock.

2. Mitchell L. Stoltz, attorney for *amici curiae.*

3. Sophia Cope, attorney for *amici curiae.*

Dated:   August 29, 2017              /s/ *Mitchell L. Stoltz*_____
                                     Mitchell L. Stoltz

i

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES .......................... i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF INTEREST ............................................................... 1

INTRODUCTION ............................................................................... 2

ARGUMENT ..................................................................................... 4

    I.    Digital Devices Contain and Access Vast Amounts of Highly Personal Information .............................................................. 4

    II.    The Border Search Exception Is Narrow ........................................... 11

    III.    All Border Searches of Digital Data, Whether "Manual" or "Forensic," are Highly Intrusive of Personal Privacy and Are Thus "Non-Routine" ..................................................................... 15

    IV.    A Probable Cause Warrant Should Be Required for Border Searches of Data Stored or Accessible on Digital Devices ................ 20

        A.   A Probable Cause Warrant Should Be Required Given the Highly Personal Information Stored and Accessible on Digital Devices ...... 21

        B.   A Probable Cause Warrant Should Be Required Because Searching Digital Data Is Not Tethered to the Narrow Purposes of the Border Search Exception ......................................................... 23

CONCLUSION ..................................................................................... 27

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(A)(7)(C) ........................................ 29

CERTIFICATE OF SERVICE ................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*Almeida-Sanchez v. United States*,
   413 U.S. 266 (1973) ................................................................. 13

*Arizona v. Gant*,
   556 U.S. 332 (2009) ................................................................. 11

*Boyd v. United States*,
   116 U.S. 616 (1886) ....................................................... 5, 13, 14

*Carroll v. United States*,
   267 U.S. 132 (1925) ........................................................... 13, 14

*Chimel v. California*,
   395 U.S. 752 (1969) ........................................................... 11, 14

*City of Indianapolis v. Edmond*,
   531 U.S. 32 (2000) ............................................................. 11, 12

*Florida v. Royer*,
   460 U.S. 491 (1983) ................................................................. 11

*Kyllo v. United States*,
   533 U.S. 27 (2001) ................................................................... 11

*Michigan Dept. of State Police v. Sitz*,
   496 U.S. 444 (1990) ................................................................. 12

*Riley v. California*,
   134 S.Ct. 2473 (2014) ....................................................... *passim*

*U.S. v. Caballero*,
   178 F.Supp.3d 1008 (S.D. Cal. 2016) ...................................... 3

*U.S. v. Escarcega*,
   2017 WL 1380555 (5th Cir. 2017) .......................................... 4

*U.S. v. Kolsuz*,
   185 F.Supp.3d 843 (E.D. Va. 2016) .............................. 2, 15, 25

iii

*U.S. v. Molina-Isidoro,*
  2016 WL 8138926 (W.D. Tex. Oct. 7, 2016) ..................................... 3, 16, 22, 25

*U.S. v. Montoya de Hernandez,*
  473 U.S. 531 (1985) .............................................................*passim*

*U.S. v. Saboonchi,*
  990 F.Supp.2d 536 (D. Md. 2014) ............................................. 15, 16

*U.S. v. Thirty-Seven (37) Photographs,*
  402 U.S. 363 (1971) .................................................................... 26

*United States v. Cotterman,*
  709 F.3d 952 (9th Cir. 2013).....................................................*passim*

*United States v. Flores-Montano,*
  541 U.S. 149 (2004) ..................................................... 2, 15, 16, 19

*United States v. Ickes,*
  393 F.3d 501 (4th Cir. 2005)........................................................ 19

*United States v. Jones,*
  565 U.S. 400 (2012) ...................................................................... 7

*United States v. Kim,*
  103 F. Supp. 3d 32 (D.D.C. 2015) ............................................. 5, 19

*United States v. Ramsey,*
  431 U.S. 606 (1977) ........................................................... 14, 15, 20

*United States v. Robinson,*
  414 U.S. 218 (1973) .................................................................... 23

*United States v. Seljan,*
  547 F.3d 993 (9th Cir. 2008).........................................................14

*Vernonia School District 47J v. Acton,*
  515 U.S. 646 (1995) ................................................................ 11, 12

## Other Authorities

Amazon, *Kindle compare* ......................................................... 7

Apple, *Use Search on Your iPhone, iPad, or iPod Touch* ..................................... 17

CBP, Federal Business Opportunities, *UFED Kits, Software Updates*
(Sept. 4, 2013) .................................................................................. 18

Cellebrite, Case Study: Cellebrite Certification Training Helps NY Agency
Maximize UFED Usage ................................................................... 18

Cellebrite, *iOS Forensics: Physical Extraction, Decoding and Analysis From
iOS Devices* ................................................................................... 17

Cellebrite, *Mobile Forensics Products* .................................................. 17

Cellebrite, *UFED Cloud Analyzer* ...................................................... 18

Cellebrite, *Unlock Digital Intelligence* (2015) ...................................... 18

Chad Haddal, *Border Security: Key Agencies and Their Missions*, Congressional
Research Service (Jan. 26, 2010) ...................................................... 14

Department of Homeland Security, *Privacy Impact Assessment for the TECS
System: CBP Primary and Secondary Processing* (Dec. 22, 2010) .................... 24

DHS, Privacy Impact Assessment for the Border Searches of Electronic Devices
(Aug. 25, 2009) ............................................................................... 21

EFF, *CBP Data Extraction Release* ...................................................... 18

Ericsson, *Ericsson Mobility Report* (June 2015) ..................................... 5

FBI, Federal Business Opportunities, *Notice of Intent to Sole Source*,
(Aug. 28, 2013) ............................................................................... 18

Fitbit, *Surge specs* ........................................................................... 7

Garmin, *Drive Product Line* ............................................................... 8

Google, *About Chromebook* ................................................................ 9

Google, *Maps* ................................................................................. 17

Letter from Shari Suzuki, Customs and Border Protection, to Mark Rumold,
Electronic Frontier Foundation (May 14, 2012) ...................................... 18

Mint, *All in One* ............................................................................. 8

National Institute of Standards and Technology, Special Pub. 800-145, *The NIST Definition of Cloud Computing*, Special Publication (Sept. 2011) ....................... 8

Nest, Meet the Nest Cam Indoor Security Camera.................................................. 8

Nissan, *NissanConnect Navigation System Features* ............................................... 8

Pew Research Center, *Mobile Technology Fact Sheet* ......................................... 5, 6

PwC Strategy&, *Connected Car Report 2016: Opportunities, Risk, and Turmoil on the Road to Autonomous Vehicles* (Sept. 28, 2016) ................... 8

Stephen Lawson, Future of Mobile Phones Is in the Cloud, Ex-Nokia CTO Says, InfoWorld (April 16, 2009).................................................................... 9

U.S. Sentencing Commission, *Overview of Federal Criminal Cases Fiscal Year 2014* ........................................................................................................... 26

Uber, *Getting a trip receipt* ..................................................................................... 9

*UFED Physical Analyzer*........................................................................................ 17

*United States Attorney's Annual Statistical Report Fiscal Year 2014* ................... 26

WhatsApp, *Security* .................................................................................................. 9

# <u>STATEMENT OF INTEREST</u>[1]

*Amici curiae* Electronic Frontier Foundation,[2] Asian Americans Advancing Justice-Asian Law Caucus,[3] Council on American-Islamic Relations (CAIR),[4] CAIR California,[5] CAIR Florida, Inc.,[6] CAIR New York,[7] CAIR Ohio,[8] and The National Association of Criminal Defense Lawyers[9] are nonprofit public interest organizations that work to protect civil liberties. *Amici curiae* advocate for the constitutional right to privacy, including at the U.S. border.

---

[1] No party's counsel authored this brief in whole or in part. Neither any party nor any party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than *amici*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief. The defendant consented and the government is not opposed to the filing of this brief.
[2] eff.org.
[3] advancingjustice-alc.org.
[4] cair.com.
[5] ca.cair.com.
[6] cairflorida.org.
[7] cair-ny.org.
[8] cairohio.com.
[9] nacdl.org.

**INTRODUCTION**

The Fourth Amendment's border search exception, permitting warrantless and suspicionless "routine" searches of belongings and persons at the U.S. border, should not apply to digital devices like Ms. Molina-Isidoro's cell phone. All border searches of the data stored or accessible on digital devices—whether "manual" or "forensic"—are "non-routine" and thus fall outside the border search exception. This is because *any search* of digital data is a "highly intrusive" search that implicates the "dignity and privacy interests" of the traveler. *U.S. v. Flores-Montano*, 541 U.S. 149, 152 (2004). Under the Supreme Court's ruling in *Riley v. California,* 134 S. Ct. 2473 (2014), border agents should be required to obtain a probable cause warrant to search the data stored or accessible on a digital device.

The *Riley* Court presented an analytical framework that complements the border search doctrine's traditional consideration of whether a search is "routine" or "non-routine." The Court explained that, in determining whether to apply an existing exception to the warrant and probable cause requirements to a "particular category of effects" such as cell phones, individual privacy interests must be balanced against legitimate governmental interests. *Id.* at 2484. The government's interests are analyzed by considering whether a search conducted without a warrant and probable cause is sufficiently "tethered" to the purposes underlying the exception. *Id.* at 2485. In the case of digital data at the border, not only are

individual privacy interests at their highest in devices such as cell phones and laptops, searches of digital devices without a warrant and probable cause are not sufficiently "tethered" to the narrow purposes justifying the border search exception: immigration and customs enforcement.

However, even if such "tethering" may be considered sufficient—meaning that there is a clear nexus between enforcing the immigration and customs laws, and conducting searches of digital devices at the border without a warrant and probable cause—the extraordinary privacy interests that travelers have in their cell phones and laptops outweigh any legitimate governmental interests. Prior to the rise of mobile computing, the "amount of private information carried by international travelers was traditionally circumscribed by the size of the traveler's luggage or automobile." *U.S. v. Cotterman*, 709 F.3d 952, 964 (9th Cir. 2013) (en banc). Today, however, the "sum of an individual's private life" sits in the pocket or purse of any traveler carrying a cell phone, laptop or other digital device. *Riley*, 134 S. Ct. at 2489.

The district court below stated, "Were this Court free to decide this matter in the first instance, it might prefer that a warrant be required to search an individual's cell phone at the border." *U.S. v. Molina-Isidoro*, 2016 WL 8138926, *8 (W.D. Tex. Oct. 7, 2016) (citing *U.S. v. Caballero*, 178 F. Supp. 3d 1008, 1016-17 (S.D. Cal. 2016)). Yet the district court felt bound by Fifth Circuit precedent

and declined to apply *Riley* to the border context or even "to decide whether the search of an individual's cell phone is a routine or nonroutine border search." *Id.*

However, a "person's digital life ought not to be hijacked simply by crossing a border." *Cotterman*, 709 F.3d at 965. This Court should take the step that the district court felt it could not take. *Amici* urge this Court to hold that all border searches of the data stored or accessible on digital devices are "non-routine," and thus, consistent with *Riley*, a probable cause warrant is required.[10]

## **ARGUMENT**

I.    **Digital Devices Contain and Access Vast Amounts of Highly Personal Information**

Before digital devices came along, border searches of personal property, like searches incident to arrest, were "limited by physical realities and tended as a general matter to constitute only a narrow intrusion on privacy." *Riley*, 134 S. Ct. at 2489. In *Riley*, the government argued that a search of cell phone data is the same as a search of physical items, and so a cell phone should fall within the search-incident-to-arrest exception, which would permit the warrantless and suspicionless search of an arrestee's cell phone. *Id.* at 2488. The Court rejected this

---

[10] After the district court opinion below, a separate panel of the Fifth Circuit issued an unpublished, *per curiam* opinion in *U.S. v. Escarcega*, 2017 WL 1380555 (5th Cir. 2017), upholding a warrantless border search of the defendant's cell phone. The court's one-page opinion did not address the facts and law set forth in this brief. *Amici* urge the present panel to conduct its own analysis of the Fourth Amendment's applicability to digital devices at the border.

argument: "That is like saying a ride on horseback is materially indistinguishable from a flight to the moon." *Id. See also U.S. v. Kim*, 103 F. Supp. 3d 32, 55 (D.D.C. 2015) (in a border search case, stating *Riley* "strongly indicate[d] that a digital data storage device cannot fairly be compared to an ordinary container when evaluating the privacy concerns involved"). The Court examined the nature of cell phones themselves—rather than how the devices are searched—and concluded they are "not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life.'" *Riley*, 134 S. Ct. at 2494-95 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)).

Most people carry portable digital devices. Cell phones in particular have become "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley*, 134 S. Ct. at 2484. Globally, there are 7.5 billion cell phone subscriptions, including 3.9 billion for a smartphone.[11] Ninety-five percent of American adults own a cell phone, with 77 percent owning a smartphone.[12] Additionally, 22 percent

---

[11] Ericsson, *Ericsson Mobility Report* (June 2017), https://www.ericsson.com/assets/local/mobility-report/documents/2017/ericsson-mobility-report-june-2017.pdf.
[12] Pew Research Center, *Mobile Technology Fact Sheet* (Jan. 12, 2017), http://www.pewinternet.org/fact-sheets/mobile-technology-fact-sheet/.

of American adults own an e-reader and 51 percent own a tablet computer.[13] As the

Supreme Court stated, "Prior to the digital age, people did not typically carry a

cache of sensitive personal information with them as they went about their day.

Now it is the person who is not carrying a cell phone, with all that it contains, who

is the exception." *Riley*, 134 S. Ct. at 2490.

Digital devices are both quantitatively and qualitatively different from

physical containers like luggage. *Id.* at 2489. Quantitatively, the vast amount of

personal data on digital devices at the border is the same as if "a person's suitcase

could reveal not only what the bag contained on the current trip, but everything it

had ever carried." *Cotterman*, 709 F.3d at 965. *See also U.S. v. Saboonchi*, 48

F.Supp.3d 815, 819 (*Saboonchi II*) (stating "the sheer quantity of information

available on a cell phone makes it unlike other objects to be searched"). With their

"immense storage capacity," cell phones, laptops, tablets and other digital devices

can contain the equivalent of "millions of pages of text, thousands of pictures, or

hundreds of videos." *Riley*, 134 S. Ct. at 2489. *See also Cotterman*, 709 F.3d at

964 ("The average 400-gigabyte laptop hard drive can store over 200 million

pages—the equivalent of five floors of a typical academic library.").

Qualitatively, digital devices "collect[] in one place many distinct types of

information … that reveal much more in combination than any isolated record."

---

[13] *Id.*

*Riley*, 134 S. Ct. at 2489. They "are simultaneously offices and personal diaries" and "contain the most intimate details of our lives." *Cotterman*, 709 F.3d at 964. "Even the most basic phones that sell for less than $20 might hold photographs, picture messages, text messages, Internet browsing history, a calendar, a thousand-entry phone book, and so on." *Riley*, 134 S. Ct. at 2489. Also, "[h]istoric location information is a standard feature on many smartphones and can reconstruct someone's specific movements down to the minute, not only around town but also within a particular building." *Id.* at 2490 (citing *U.S. v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring) ("GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations.")).

Even digital devices with more limited features and storage capacity than cell phones and laptop computers contain a wide variety of highly personal information. Wearable fitness devices track a variety of data related to an individual's health.[14] E-readers can reveal every book a person has read.[15]

---

[14] For example, FitBit's Surge records steps, distance, floors climbed, calories burned, active minutes, workouts, sports played, sleep, and heart rate. It also records non-health information including the user's GPS location, and call and text notifications. *See* Fitbit, *Surge specs*, *https*://www.fitbit.com/surge.

[15] For example, Amazon's Kindle "holds thousands of books" as well as personal documents. *See* Amazon, *Kindle compare*, http://www.amazon.com/dp/B00I15SB16/ref=nav_shopall_k_ki#kindle-compare.

Dedicated GPS devices, including car navigation systems, show where someone has traveled and store the addresses of personal associates or favorite destinations.[16]

Importantly, many digital devices, including Ms. Molina-Isidoro's cell phone, permit access to personal information stored in the "cloud"—that is, not on the devices themselves, but on servers accessible via the Internet.[17] Thus, border agents can get a comprehensive look at a traveler's financial life with smartphone or tablet applications ("apps") that link to bank, credit card, and retirement accounts, as well as monthly bills.[18] Or they can see inside a traveler's home via live video feeds provided by home security apps.[19] Some digital devices already

---

[16] *See*, *e.g.*, Garmin, *Drive Product Line*, http://www8.garmin.com/automotive/pdfs/drive.pdf; Nissan, *NissanConnect Navigation System Features*, https://www.nissanusa.com/connect/features-app/navigation-system. Additionally, the next generation of "connected cars"—with Internet access, and a variety of sensors and features—promise to be a treasure trove of data on drivers and their passengers. *See, e.g.,* PwC Strategy&, *Connected Car Report 2016: Opportunities, Risk, and Turmoil on the Road to Autonomous Vehicles* (Sept. 28, 2016), http://www.strategyand.pwc.com/reports/connected-car-2016-study.

[17] *See* National Institute of Standards and Technology, Special Pub. 800-145, *The NIST Definition of Cloud Computing* (Sept. 2011), http://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-145.pdf.

[18] *See*, *e.g.*, Mint, *All in One*, https://www.mint.com/how-mint-works.

[19] See, e.g., Nest, Meet the Nest Cam Indoor Security Camera, https://nest.com/camera/meet-nest-cam/.

store virtually all data in the cloud,[20] and some analysts predict this will become

ubiquitous.[21] Because cloud data can "appear as a seamless part of the digital

device when presented at the border," *Cotterman*, 709 F.3d at 965, border agents

"would not typically know whether the information they are viewing was stored

locally … or has been pulled from the cloud," *Riley*, 134 S. Ct. at 2491. In this

case, border agents accessed Ms. Molina-Isidoro's cloud data: they opened her

Uber and WhatsApp cell phone apps, which store user data remotely on the

companies' servers.[22] There is no indication that border agents put her phone in

airplane mode or otherwise disconnected it from the Internet when they accessed

these apps.[23]

---

[20] *See, e.g.*, Google, *About Chromebook* ("Gmail, Maps, Docs and pics [are] safely stored in the cloud, so a laptop spill really is just a laptop spill"), https://www.google.com/chromebook/about/.

[21] See, e.g., Stephen Lawson, Future of Mobile Phones Is in the Cloud, Ex-Nokia CTO Says, InfoWorld (April 16, 2009) ("The standard architecture that will realize the promise of mobile phones won't be hardware or software but a cloud-based platform…."), http://www.infoworld.com/article/2631862/mobile-apps/future-of-mobile-phones-is-in-the-cloud--ex-nokia-cto-says.html

[22] For example, if a phone is in airplane mode, the Uber app will not load the user's trip history stored on Uber's servers. *See generally* Uber, *Getting a trip receipt*, https://help.uber.com/h/846f6cad-6f27-492a-9e0b-d2f056e1298e. And while WhatsApp "doesn't store your messages on our servers once we deliver them," if the app is open and connected to the Internet, any new messages that are delivered are pulled from WhatsApp's servers. *See* WhatsApp, *Security*, https://www.whatsapp.com/security/.

[23] CBP recently announced that border agents may not access cloud data when searching a digital device. E.D. Cauchi, *Border Patrol Says It's Barred From Searching Cloud Data on Phones*, NBC News (July 12, 2017), http://www.nbcnews.com/news/us-news/border-patrol-says-it-s-barred-searching-

Therefore, today's digital devices enable the reconstruction of "the sum of an individual's private life" covering a lengthy amount of time—"back to the purchase of the [device], or even earlier." *Riley*, 134 S. Ct. at 2489. While people cannot physically "lug around every piece of mail they have received for the past several months, every picture they have taken, or every book or article they have read," they now do so digitally. *Id.* at 2489. *See also Cotterman*, 709 F.3d at 965 (stating "digital devices allow us to carry the very papers we once stored at home"). But it is not just that a phone "contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is." *Riley*, 134 S. Ct. at 2491.

In sum, portable digital devices differ wildly from luggage and other physical items a person possesses when entering or leaving the country. Now is the time to acknowledge the full force of the privacy implications of border searches of digital devices. As the Supreme Court said, "It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology." *Kyllo v. U.S.*, 533 U.S. 27, 33-34

cloud-data-phones-n782416. *Amici* are aware of no such policy at the time of the border search at issue here (July 2016). Indeed, media reports indicate that border agents commonly search cloud data when searching digital devices. EFF, *CBP Responds to Sen. Wyden: Border Agents May Not Search Travelers' Cloud Content* (July 17, 2017), https://www.eff.org/deeplinks/2017/07/cbp-responds-sen-wyden-border-agents-may-not-search-travelers-cloud-content.

(2001). Thus, "the rule we adopt must take account of more sophisticated systems that are already in use or in development." *Id.* at 36.

## II.    The Border Search Exception Is Narrow

"[T]he ultimate touchstone of the Fourth Amendment is reasonableness." *Riley*, 134 S. Ct. at 2482. Normally, reasonableness requires a warrant based on probable cause. *Id.* (citing *Vernonia School District 47J v. Acton*, 515 U.S. 646, 653 (1995)). However, *in limited circumstances*, neither a warrant nor probable cause is required when the "primary purpose" of a search is "beyond the normal need for law enforcement" or "beyond the general interest in crime control." *Vernonia*, 515 U.S. at 653; *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 48 (2000). Crucially, searches without a warrant and probable cause (including *suspicionless* searches) under these limited exceptions must be "tethered" to the purposes justifying the exception. *Riley*, 134 S. Ct. at 2485 (citing *Arizona v. Gant*, 556 U.S. 332, 343 (2009)). *See also Florida v. Royer*, 460 U.S. 491, 500 (1983) (warrantless searches "must be limited in scope to that which is justified by the particular purposes served by the exception").

The search-incident-to-arrest exception at issue in *Riley* is not justified by the need to gather additional evidence of the alleged crime, but instead the need to protect officer safety and prevent the destruction of evidence. *Riley*, 134 S. Ct. at 2483 (citing *Chimel v. California*, 395 U.S. 752 (1969)). The warrantless and

suspicionless drug tests at issue in *Vernonia* were upheld as reasonable to protect the health and safety of minor student athletes. 515 U.S. at 665. Warrantless and suspicionless sobriety checkpoints are reasonable because they advance the non-criminal purpose of roadway safety. *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444 (1990). By contrast, the warrantless and suspicionless vehicle checkpoint in *Edmond* to uncover illegal narcotics was unconstitutional because its primary purpose was to "uncover evidence of ordinary criminal wrongdoing." *Edmond*, 531 U.S. at 42.

The border search exception permits warrantless and suspicionless "routine" searches of individuals and items in their possession when crossing the U.S. border. *U.S. v. Montoya de Hernandez*, 473 U.S. 531 (1985). *Edmond* clarified that although some exceptions, like border searches, might involve law enforcement activities because they can result in "arrests and criminal prosecutions," that does not mean that the exceptions were "designed primarily to serve the general interest in crime control." 531 U.S. at 42. Rather, the border search exception is intended to serve the narrow purposes of enforcing the immigration and customs laws. *See Cotterman*, 709 F.3d at 956 (emphasizing the "narrow" scope of the border search exception).

In 1925, the Supreme Court articulated these two limited justifications for warrantless and suspicionless searches at the border: "Travelers may be so stopped

in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify [i] himself as *entitled* to come in, and [ii] his belongings as effects which may be *lawfully* brought in." *Carroll v. U.S.*, 267 U.S. 132, 154 (1925) (emphasis added). *Carroll* relied on *Boyd*, which drew a clear distinction between searches and seizures consistent with the purposes of the border search exception—in particular, enforcing customs laws—and those to obtain evidence for a criminal case:

> The search for and seizure of … goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him.

116 U.S. at 623.

Accordingly, under the immigration and customs rationales, the border search exception permits warrantless and suspicionless "routine" searches in order to prevent undocumented immigrants from entering the country, *Almeida-Sanchez v. U.S.*, 413 U.S. 266, 272 (1973), and to enforce the laws regulating the importation or exportation of goods, including ensuring that duties are paid on those goods, *Boyd*, 116 U.S. at 624. The border search exception may also be invoked to prevent the importation of contraband such as drugs, weapons, agricultural products, and other items that could harm individuals or industries if brought into the country. *See Montoya de Hernandez*, 473 U.S. at 537 (discussing

"the collection of duties and … prevent[ing] the introduction of contraband into this country").[24]

While the Supreme Court in *U.S. v. Ramsey* stated that "searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border," 431 U.S. 606, 616 (1977), the Court's reliance on *Boyd* and *Carroll* shows that the Court understood that this government power must remain tethered to the specific and narrow purposes of enforcing the immigration and customs laws. *Id.* at 617-19. This parallels both *Chimel* and *Riley*, which held that searches of a home and cell phone data, respectively, were outside the scope of the narrow purposes of the search-incident-to-arrest exception. *See Riley*, 134 S. Ct. at 2483 (citing *Chimel*, 395 U.S. at 753-54, 762-63).

Therefore, it is not "anything goes" at the border. *U.S. v. Seljan*, 547 F.3d 993, 1000 (9th Cir. 2008) (en banc). Rather, the Fourth Amendment requires that border searches without a warrant and probable cause must be "tethered" to

---

[24] *See also* Chad Haddal, Cong. Research Serv., 7-5700, *Border Security: Key Agencies and Their Missions*, 2 (Jan. 26, 2010) ("CRS Report") ("CBP's mission is to prevent terrorists and terrorist weapons from entering the country, provide security at U.S. borders and ports of entry, apprehend illegal immigrants, stem the flow of illegal drugs, and protect American agricultural and economic interests from harmful pests and diseases."), https://www.fas.org/sgp/crs/homesec/RS21899.pdf.

enforcing the immigration and customs laws.

## III. All Border Searches of Digital Data, Whether "Manual" or "Forensic," are Highly Intrusive of Personal Privacy and Are Thus "Non-Routine"

Not all border searches are "routine." In *Ramsey*, the Supreme Court made

clear that the Constitution restricts the border search exception: "The border-search

exception is grounded in the recognized right of the sovereign to control, *subject to*

*substantive limitations imposed by the Constitution*, who and what may enter the

country." 431 U.S. at 620 (emphasis added). The Court has defined "non-routine"

border searches as "highly intrusive" or those that impact the "dignity and privacy

interests" of travelers, *Flores-Montano*, 541 U.S. at 152, or are carried out in a

"particularly offensive manner," *Ramsey*, 431 U.S. at 618 n.13. Thus, in *Montoya*

*de Hernandez*, the Supreme Court held that detaining a traveler until she defecated

to see if she was smuggling drugs in her digestive tract was a "non-routine" seizure

and search that required reasonable suspicion. 473 U.S. at 541.

Some courts have concluded that only "forensic" searches of digital data are

"non-routine" (and thus require reasonable suspicion), while "manual" searches of

the same data are "routine" and fall within the border search exception. *See, e.g.*,

*Cotterman*, 709 F.3d at 967-68; *U.S. v. Kolsuz*, 185 F.Supp.3d 843, 858 (E.D. Va.

2016); *U.S. v. Saboonchi*, 990 F.Supp.2d 536, 547-48 (D. Md. 2014) (*Saboonchi*

*I*). In this case, the district court acknowledged *Riley*'s conclusion that "[m]odern

cell phones, as a category, implicate privacy concerns far beyond those implicated

by the search of a … wallet, or a purse." *Molina-Isidoro*, 2016 WL 8138926, *at* \*4.

Unfortunately, the district court declined "to decide whether the search of an

individual's cell phone is a routine or nonroutine border search." *Id.* at \*8.

However, *any* search of the data stored or accessible on a digital device—

whether manually or with specialized "forensic" tools—is a "highly intrusive"

search that implicates the "dignity and privacy interests" of the traveler, or may be

considered "particularly offensive," and thus is "non-routine." *Flores-Montano*,

541 U.S. at 152.

Given the vast amount of highly personal information that digital devices

contain, as well as their ability to connect to sensitive data in the cloud, "manual"

searches of digital devices at the border greatly burden privacy interests in ways

that searches of luggage do not. *See Saboonchi I*, 990 F.Supp.2d at 547

(acknowledging that "a conventional computer search can be deeply probing").

"Manual" searches of digital data can access emails, voicemails, text messages,

call logs, contact lists, photographs, videos, calendar entries, shopping lists,

personal notes, and web browsing history, as well as cloud data via apps. While the

search of Ms. Molina-Isidoro's cell phone was "manual," it focused on her

WhatsApp and Uber apps, both of which can connect to data stored in the cloud.

*Molina-Isidoro*, 2016 WL 8138926, *at* \*2. Even a history of a traveler's physical

location may be uncovered through a "manual" search: for example, on an iPhone,

a user may have toggled on the "Frequent Locations" feature.[25] Or, if a traveler

uses Google Maps while logged into their Google account, a "manual" search of

the app would reveal the traveler's navigation history.[26] As the cost of storage

drops and technology advances, digital devices will hold ever greater amounts of

personal information and feature increasingly powerful search capabilities.[27] Thus,

"manual" searches will reveal ever more personal information, making the

distinction between them and "forensic" searches even more meaningless.

Additionally, new technology enables border agents to quickly conduct

"forensic" searches at the border itself. This empowers the government to invade

the digital privacy of ever growing numbers of travelers. For example, Cellebrite

manufactures several Universal Forensic Extraction Devices ("UFEDs") that plug

into cell phones, laptops, tablets and other mobile devices and enable the quick and

easy extraction of detailed digital data.[28] UFEDs also enable access to social media

accounts and other cloud content, which the company describes as "a virtual

---

[25] To change iOS 10 settings go to Settings>Privacy>Location Services>System Services>Frequent Locations.

[26] *See* Google, *Maps*, https://www.google.com/maps/.

[27] Apple's iPhone currently has a search function for the entire phone that pulls content based on keywords. Apple, *Use Search on Your iPhone, iPad, or iPod Touch*, https://support.apple.com/en-us/HT201285.

[28] *See* Cellebrite, *Mobile Forensics Products*, http://www.cellebrite.com/Mobile-Forensics/Products; Cellebrite, *UFED Physical Analyzer*, http://www.cellebrite.com/Mobile-Forensics/Applications/ufed-physical-analyzer; Cellebrite, *iOS Forensics: Physical Extraction, Decoding and Analysis From iOS Devices*, http://www.cellebrite.com/Pages/ios-forensics-physical-extraction-decoding-and-analysis-from-ios-devices.

goldmine of potential evidence for forensic investigators."[29] UFEDs are small and portable, enabling "simple, real-time extractions onsite."[30] A UFED can extract eight gigabytes of data from an Apple iPhone in a "mere 20 minutes," while its search functions cut the search time "from days to minutes."[31] CBP is already using UFEDs.[32] In training materials, the agency lauds the devices' portability and ease of use in the field, stressing that no computer is needed to extract data like call logs, videos, pictures, and text messages.[33] The FBI also uses UFEDs and prefers this technology due to its "extraction speed and intuitive user interface."[34]

Thus, the rapid rate of technological change belies any suggestion, based on

---

[29] Cellebrite, *UFED Cloud Analyzer*, http://www.cellebrite.com/Mobile-Forensics/Products/ufed-cloud-analyzer.

[30] Cellebrite, *Unlock Digital Intelligence*, 3 (2015), http://www.cellebrite.com/Media/Default/Files/Forensics/Solution-Briefs/Mobile-Forensics-Solution-Brief.pdf.

[31] Cellebrite, *Case Study: Cellebrite Certification Training Helps NY Agency Maximize UFED Usage*, 1, http://www.cellebrite.com/Media/Default/Files/Forensics/Case-Studies/Cellebrite-Certification-Training-Helps-NY-Agency-Maximize-UFED-Usage_Case%20Study.pdf.

[32] CBP, Federal Business Opportunities, *UFED Kits, Software Updates* (Sept. 4, 2013), https://www.fbo.gov/index?s=opportunity&mode=form&tab=core&id=44c0118f0 eea7370c6eb1d5a8bf711d7; Letter from Shari Suzuki, CBP, to Mark Rumold, EFF (May 14, 2012), https://www.eff.org/files/filenode/foia__20120808155244.pdf,

[33] EFF, *CBP Data Extraction Release*, 31, 33, https://www.eff.org/document/cbp-data-extraction-release.

[34] FBI, Federal Business Opportunities, *Notice of Intent to Sole Source* (Aug. 28, 2013), https://www.fbo.gov/index?s=opportunity&mode=form&id=e3742ca87da9650f71 9e902f86ad36b6&tab=core&_cview=0.

much more primitive technology, that "[c]ustoms agents have neither the time nor the resources to search the contents of every computer." *U.S. v. Ickes*, 393 F.3d 501, 507 (4th Cir. 2005). As the Ninth Circuit noted, "It is the *potential* unfettered dragnet effect that is troublesome." *Cotterman*, 709 F.3d at 966 (emphasis added).

Therefore, the dichotomy between "manual" and "forensic" searches is factually meaningless and constitutionally unworkable. Constitutional rights should not turn on such a flimsy distinction. *See Kim*, 103 F. Supp. 3d at 55 (stating that whether the border search of the defendant's laptop was reasonable does not "turn on the application of an undefined term like 'forensic'"). Importantly, *Riley* did not distinguish between how digital devices are searched. Even though the searches in *Riley* were *manual* searches (like the search of Ms. Molina-Isidoro's cell phone), the Court required a probable cause warrant for *all searches* of a cell phone seized incident to an arrest. *Riley*, 134 S. Ct. at 2480-81, 2493.

In sum, all searches of digital data at the border are "non-routine" and thus fall outside the border search exception because the government's conduct is the same: accessing to an unprecedented degree tremendous amounts of highly personal information. *See Flores-Montano*, 541 U.S. at 154 n.2 ("We again leave open the question 'whether, and under what circumstances, a border search might be deemed 'unreasonable' because of the particularly offensive manner in which it

is carried out.'"").

## IV.   A Probable Cause Warrant Should Be Required for Border Searches of Data Stored or Accessible on Digital Devices

The Supreme Court prefers "clear guidance" and "categorical rules." *Riley*, 134 S. Ct. at 2491. The *Riley* Court's analytical framework complements the border search doctrine's traditional consideration of whether a search is "routine" or "non-routine." In determining whether to apply an existing exception to the warrant and probable cause requirements to a "particular category of effects," individual privacy interests must be balanced against legitimate governmental interests. *Riley*, 134 S. Ct. at 2484. In the case of border searches of digital devices, this balancing clearly tips in favor of the traveler. Given that *Ramsey* noted the similarity between the border search exception and the search-incident-to-arrest exception, 431 U.S. at 621, this Court should adopt the clear rule that *all* border searches of data stored or accessible on digital devices are "non-routine" searches that require a probable cause warrant.[35]

Border agents may still benefit from the border search exception: for example, they can search without a warrant or individualized suspicion the

---

[35] While the Supreme Court's border search cases have not required more than reasonable suspicion for "non-routine" searches, the Court has never said that reasonable suspicion is the absolute upper limit for searches conducted at the border. *See, e.g.*, *Montoya de Hernandez* 473 U.S. at 541 n.4 ("[W]e suggest no view on what level of suspicion, if any, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches.").

"physical aspects" of a digital device to ensure that it does not contain contraband such as drugs or explosives. *See Riley*, 134 S. Ct. at 2485. Moreover, any concerns that a warrant is difficult to obtain at the border should be allayed given that "[r]ecent technological advances … have … made the process of obtaining a warrant itself more efficient." *Riley*, 134 S. Ct. at 2493.[36]

### A.   A Probable Cause Warrant Should Be Required Given the Highly Personal Information Stored and Accessible on Digital Devices

Modern digital devices like cell phones and laptops reveal the "sum of an individual's private life," *Riley*, 134 S. Ct. at 2489, making any search by the government an unprecedented intrusion into individual privacy. Any border search of a digital device is highly intrusive and "bears little resemblance" to searches of travelers' luggage. *Id.* at 2485. Even DHS acknowledges that "a search of [a] laptop increases the possibility of privacy risks due to the vast amount of information potentially available on electronic devices."[37]

The fact that luggage may contain physical items with personal information does not negate the unique privacy interests in digital devices. A few letters in a suitcase do not compare to the detailed record of correspondence over months or

---

[36] Border agents clearly have the ability to seek and obtain judicial authorization for "non-routine" searches and seizures. *See, e.g., Montoya de Hernandez*, 473 U.S. at 535 ("[C]ustoms officials sought a court order authorizing a pregnancy test, an [x-ray], and a rectal examination.").

[37] DHS, Privacy Impact Assessment for the Border Searches of Electronic Devices, 2 (Aug. 25, 2009), http://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_cbp_laptop.pdf.

years that a digital device may contain and even a "manual" search would reveal.

Also, paper diaries do not have a keyword search function and people do not carry

all the diaries they have ever owned when they travel. The *Riley* Court stated:

> [T]he fact that a search in the pre-digital era could have turned up a photograph or two in a wallet does not justify a search of thousands of photos in a digital gallery. The fact that someone could have tucked a paper bank statement in a pocket does not justify a search of every bank statement from the last five years. And to make matters worse, such an analogue test would allow law enforcement to search a range of items contained on a phone, even though people would be unlikely to carry such a variety of information in physical form.

134 S. Ct. at 2493.

The district court acknowledged *Riley*'s conclusion that "[m]odern cell

phones, as a category, implicate privacy concerns far beyond those implicated by

the search of a … wallet, or a purse." *Molina-Isidoro*, 2016 WL 8138926, *at* *4.

Thus, the district court stated, "Were this Court free to decide this matter in the

first instance, it might prefer that a warrant be required to search an individual's

cell phone at the border." *Id.* at *8.

Nevertheless, the district court, feeling constrained by Fifth Circuit

precedent, stated that it would require no more than reasonable suspicion at the

border. *Id.* at *6. However, the reasonable suspicion standard insufficiently

protects Fourth Amendment rights in this context. The proper level of

constitutional protection is a probable cause warrant.

**B.    A Probable Cause Warrant Should Be Required Because Searching Digital Data Is Not Tethered to the Narrow Purposes of the Border Search Exception**

Under the *Riley* balancing test, the government's interests are analyzed by considering whether a search conducted without a warrant or probable cause is "tethered" to the purposes underlying the exception. 134 S. Ct. at 2485. In the case of digital data at the border, searches of digital devices without a warrant and probable cause are not sufficiently "tethered" to the narrow purposes justifying the border search exception: immigration and customs enforcement. As with the search-incident-to-arrest exception, the border search exception might "strike[] the appropriate balance in the context of physical objects," but its underlying rationales do not have "much force with respect to digital content on cell phones" or other digital devices. *Id.* at 2484 (citing *U.S. v. Robinson*, 414 U.S. 218 (1973)).

In creating the categorical rule that the search-incident-to-arrest exception does not extend to digital devices like cell phones, the *Riley* Court found that searches without a warrant and probable cause of data on digital devices seized following an arrest are not sufficiently "tethered" to the narrow purposes of the search-incident-to-arrest exception: to protect officers from an arrestee who might grab a weapon, and to prevent the arrestee from destroying evidence. *Id.* at 2483, 2485-86. The Court stated that "data on the phone can endanger no one," and the probabilities are small that associates of the arrestee will remotely delete digital

data or that an officer will discover an unlocked phone in time to thwart a

password lock or encryption. *Id.* at 2485-88. The Court concluded that neither

"problem is prevalent," and therefore their possibilities do not justify embodying

such a significant privacy invasion within a categorical rule—that is, permitting a

warrantless search of a cell phone *for every arrest. Id.*

Likewise, searches of digital devices at the border without a warrant and

probable cause are not sufficiently "tethered" to the narrow purposes of enforcing

the immigration and customs laws.

Border agents determine a traveler's immigration status and authority to

enter the United States, not by inspecting the personal data on a digital device, but

rather by inspecting official documents such as a passport or visa, and by

consulting government databases that contain additional information such as

outstanding arrest warrants and watchlist designations.[38]

Border agents enforce customs laws by interviewing travelers, examining

their luggage or vehicles, and if necessary, their persons. The traditional purpose of

the customs rationale of the border search exception is to prevent physical items

from entering (or leaving) the country at the moment the traveler crosses the

---

[38] *See* CRS Report at 2 ("CBP inspectors enforce immigration law by examining and verifying the travel documents of incoming international travelers to ensure they have a legal right to enter the country."); DHS, *Privacy Impact Assessment for the TECS System: CBP Primary and Secondary Processing,* 8 (Dec. 22, 2010), http://www.dhs.gov/xlibrary/assets/privacy/privacy-pia-cbp-tecs.pdf.

border, typically because the items were not properly declared for duties, or are contraband that could harm individuals or industries if brought into the country. Just as the *Riley* Court stated that "data on the phone can endanger no one," 134 S. Ct. at 2485, physical items cannot be hidden in digital data.

In this case, Ms. Molina-Isidoro is being prosecuted for attempting to import methamphetamine into the country. *Molina-Isidoro*, 2016 WL 8138926, *2. While drugs are physical items that were, in fact, found in Ms. Molina-Isidoro's luggage, a warrantless search of Ms. Molina-Isidoro's cell phone is not sufficiently "tethered" to enforcing laws against importing illegal drugs. As the district court stated, a warrantless search of "the contents of a cell phone does not seem to directly contribute to [one] justification for the border search exception—i.e., preventing the entry of unwanted illicit substances into the country." *Id.* at *8, n.10. *See also Kolsuz*, 185 F. Supp. 3d at 858 (stating that digital data "is merely indirect evidence of the things an individual seeks to export illegally—not the things themselves—and therefore the government's interest in obtaining this information is less significant than the government's interest in directly discovering the items to be exported illegally," and "any digital information contained on a cell phone that is relevant to exporting goods illegally can be easily obtained once a border agent establishes some level of individualized suspicion").

Some digital content, such as child pornography, may be considered "digital

contraband" that may be interdicted at the U.S. border. *Cf. U.S. v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 376–77 (1971) ("Congress may declare [obscenity] contraband and prohibit its importation."). However, the government has not demonstrated that "digital contraband"—unlike illegal drugs, for example—is a significant or "prevalent" problem *at the border* that justifies a *categorical rule* generally permitting border searches of digital devices absent a warrant and probable cause.[39] As the Ninth Circuit said, "legitimate concerns about child pornography do not justify unfettered crime-fighting searches or an unregulated assault on citizens' private information." *Cotterman*, 709 F.3d at 966.

Ultimately, even if "tethering" may be considered sufficient—meaning that there is a clear nexus between enforcing the immigration and customs laws, and conducting searches of digital devices at the border without a warrant and probable cause—the extraordinary privacy interests that travelers have in their cell phones and laptops still outweigh any legitimate governmental interests. Governmental

---

[39] Of the 56,218 criminal cases filed in federal court in the 2014 fiscal year, only 102 or 0.2 percent involved customs violations. *See* DOJ, *United States Attorney's Annual Statistical Report Fiscal Year 2014* 11-12, http://www.justice.gov/sites/default/files/usao/pages/attachments/2015/03/23/14sta trpt.pdf. In the 2014 fiscal year, child pornography made up only 2.5 percent of all federal "offenders" prosecuted and sentenced in federal court. *See* U.S. Sentencing Commission, *Overview of Federal Criminal Cases Fiscal Year 2014* 2 (Aug. 2015), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/ research-publications/2015/FY14_Overview_Federal_Criminal_Cases.pdf. This represents *all* child pornography offenders, not just those apprehended at the border.

interests do "not justify dispensing with the warrant requirement across the board." *Riley*, 134 S. Ct. at 2486. "The Supreme Court has never endorsed the proposition that the goal of deterring illegal contraband at the border suffices to justify any manner of intrusive search." *Cotterman*, 709 F.3d at 967.

## CONCLUSION

This Court should adopt the categorical rule that all border searches of data stored or accessible on digital devices are "non-routine," and thus, consistent with *Riley v. California*, a probable cause warrant is required.

Dated: August 29, 2017

Respectfully submitted,

/s/ *Mitchell L. Stoltz*
Mitchell L. Stoltz
  *Counsel of Record*
Sophia Cope
Adam Schwartz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
(415) 436-9333
mitch@eff.org

*Counsel for Amici Curiae*
*EFF, AAAJ-ALC, CAIR,*
*and four CAIR Chapters*

Nicole DeBorde
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
712 Main Street, Suite 2400
Houston, TX 77002
(713) 526-6300

*Counsel for Amicus Curiae*
*National Association of Criminal*
*Defense Lawyers*

Cynthia Orr
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
Goldstein, Goldstein, Hilly & Orr
310 S. St. Mary's Street
29th Floor Tower Life Building
San Antonio, TX 78205
(210) 226-1463

*Counsel for Amicus Curiae National
Association of Criminal Defense
Lawyers*

Michelle Simpson Tuegel
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
Hunt & Tuegel PLLC
ALICO Building, Suite 1208
425 Austin Avenue
Waco, TX 76703
(254) 753-3738

*Counsel for Amicus Curiae National
Association of Criminal Defense
Lawyers*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(A)(7)(C)**

I hereby certify as follows:

1.      The foregoing Brief of *Amici Curiae* complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  The brief is printed in proportionally spaced 14-point type, and there are 6,311 words in the brief according to the word count of the word-processing system used to prepare the brief (excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)).

2.      The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and with the type style requirements of Fed. R. App. P. 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Mac 2011 in 14-point Times New Roman font.

Dated:   August 29, 2017               /s/ *Mitchell L. Stoltz*
                                       Mitchell L. Stoltz

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeal for the Fifth Circuit by using the appellate CM/ECF System on August 29, 2017. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:   August 29, 2017                  /s/ *Mitchell L. Stoltz*
                                                   Mitchell L. Stoltz

Exhibit 2

Case No. 17-50070

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MARIA ISABEL MOLINA-ISIDORO,

*Defendant-Appellant.*

_____

**BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION,
ASIAN AMERICANS ADVANCING JUSTICE-ASIAN LAW CAUCUS,
COUNCIL ON AMERICAN-ISLAMIC RELATIONS (CAIR),
CAIR CALIFORNIA, CAIR FLORIDA, CAIR NEW YORK, CAIR OHIO,
AND THE NATIONAL ASSOCIATION OF CRIMINAL DEFENSE
LAWYERS IN SUPPORT OF DEFENDANT-APPELLANT**

_____

On Appeal from the U.S. District Court for the Western District of Texas, El Paso
The Honorable Philip R. Martinez, U.S. District Court Judge
Case No. 3:16-cr-1402-1

_____

Mitchell L. Stoltz
  *Counsel of Record*
Sophia Cope
Adam Schwartz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
(415) 436-9333
mitch@eff.org

*Counsel for Amici Curiae
EFF, AAAJ-ALC, CAIR,
and four CAIR Chapters*

Nicole DeBorde
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
712 Main Street, Suite 2400
Houston, TX 77002
(713) 526-6300

*Counsel for Amicus Curiae
National Association of Criminal
Defense Lawyers*

*(Additional counsel listed inside cover)*

Cynthia Orr
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
Goldstein, Goldstein, Hilly & Orr
310 S. St. Mary's Street
29th Floor Tower Life Building
San Antonio, TX 78205
(210) 226-1463

*Counsel for Amicus Curiae National
Association of Criminal Defense
Lawyers*

Michelle Simpson Tuegel
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
Hunt & Tuegel PLLC
ALICO Building, Suite 1208
425 Austin Avenue
Waco, TX 76703
(254) 753-3738

*Counsel for Amicus Curiae National
Association of Criminal Defense
Lawyers*

## SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

Pursuant to this Court's Rule 29.2, the undersigned counsel of record for *amici curiae* certify that the following additional persons and entities have an interest in the outcome of this case.

1.  Electronic Frontier Foundation, Asian Americans Advancing Justice-Asian Law Caucus, Council on American-Islamic Relations (CAIR), Council on American-Islamic Relations California, CAIR Florida, Inc., Council on American-Islamic Relations New York, Inc., Council on American-Islamic Relations Ohio, and The National Association of Criminal Defense Lawyers, *amici curiae.  Amici curiae* are nonprofit organization recognized as tax exempt under Internal Revenue Code § 501(c)(3).  They have no parent corporation and no publicly held corporation owns 10 percent or more of their stock.

2.  Mitchell L. Stoltz, attorney for *amici curiae.*

3.  Sophia Cope, attorney for *amici curiae.*

Dated:  August 7, 2017            /s/ *Mitchell L. Stoltz*
                        Mitchell L. Stoltz

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES .......................... i

TABLE OF CONTENTS ....................................................................... ii

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT OF INTEREST ................................................................ 1

INTRODUCTION ................................................................................. 2

ARGUMENT ....................................................................................... 4

    I.    Digital Devices Contain and Access Vast Amounts of Highly Personal Information ............................................................... 4

    II.   The Border Search Exception Is Narrow ............................................ 11

    III.  All Border Searches of Digital Data, Whether "Manual" or "Forensic," are Highly Intrusive of Personal Privacy and Are Thus "Non-Routine" ...................................................................... 15

    IV.  A Probable Cause Warrant Should Be Required for Border Searches of Data Stored or Accessible on Digital Devices ................ 20

        A.   A Probable Cause Warrant Should Be Required Given the Highly Personal Information Stored and Accessible on Digital Devices ....... 21

        B.   A Probable Cause Warrant Should Be Required Because Searching Digital Data Is Not Tethered to the Narrow Purposes of the Border Search Exception ........................................................... 23

CONCLUSION ................................................................................... 27

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(A)(7)(C) ....................................... 29

CERTIFICATE OF SERVICE ................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*Almeida-Sanchez v. United States*,
413 U.S. 266 (1973)..................................................................................13

*Arizona v. Gant*,
556 U.S. 332 (2009)..................................................................................11

*Boyd v. United States*,
116 U.S. 616 (1886)..........................................................................5, 13, 14

*Carroll v. United States*,
267 U.S. 132 (1925)............................................................................13, 14

*Chimel v. California*,
395 U.S. 752 (1969)............................................................................11, 14

*City of Indianapolis v. Edmond*,
531 U.S. 32 (2000)..............................................................................11, 12

*Florida v. Royer*,
460 U.S. 491 (1983)..................................................................................11

*Kyllo v. United States*,
533 U.S. 27 (2001)....................................................................................11

*Michigan Dept. of State Police v. Sitz*,
496 U.S. 444 (1990)..................................................................................12

*Riley v. California*,
134 S.Ct. 2473 (2014).........................................................................*passim*

*U.S. v. Caballero*,
178 F.Supp.3d 1008 (S.D. Cal. 2016)..........................................................3

*U.S. v. Escarcega*,
2017 WL 1380555 (5th Cir. 2017) ..............................................................4

*U.S. v. Kolsuz*,
185 F.Supp.3d 843 (E.D. Va. 2016) ................................................2, 15, 25

iii

*U.S. v. Molina-Isidoro*,
  2016 WL 8138926 (W.D. Tex. Oct. 7, 2016) ......................................3, 16, 22, 25

*U.S. v. Montoya de Hernandez*,
  473 U.S. 531 (1985) .................................................................................*passim*

*U.S. v. Saboonchi*,
  990 F.Supp.2d 536 (D. Md. 2014) ..............................................................15, 16

*U.S. v. Thirty-Seven (37) Photographs*,
  402 U.S. 363 (1971) ...........................................................................................26

*United States v. Cotterman*,
  709 F.3d 952 (9th Cir. 2013) ...............................................................*passim*

*United States v. Flores-Montano*,
  541 U.S. 149 (2004) ..........................................................................2, 15, 16, 19

*United States v. Ickes*,
  393 F.3d 501 (4th Cir. 2005) ...........................................................................19

*United States v. Jones*,
  565 U.S. 400 (2012) ...........................................................................................7

*United States v. Kim*,
  103 F. Supp. 3d 32 (D.D.C. 2015) ................................................................5, 19

*United States v. Ramsey*,
  431 U.S. 606 (1977) ..............................................................................14, 15, 20

*United States v. Robinson*,
  414 U.S. 218 (1973) ..........................................................................................23

*United States v. Seljan*,
  547 F.3d 993 (9th Cir. 2008) ............................................................................14

*Vernonia School District 47J v. Acton*,
  515 U.S. 646 (1995) ....................................................................................11, 12

## Other Authorities

Amazon, *Kindle compare* ...........................................................................................7

Apple, *Use Search on Your iPhone, iPad, or iPod Touch* ....................................17

CBP, Federal Business Opportunities, *UFED Kits, Software Updates* (Sept. 4, 2013)................................................................................18

Cellebrite, *Case Study: Cellebrite Certification Training Helps NY Agency Maximize UFED Usage*..........................................................18

Cellebrite, *iOS Forensics: Physical Extraction, Decoding and Analysis From iOS Devices*.......................................................................17

Cellebrite, *Mobile Forensics Products*...................................................17

Cellebrite, *UFED Cloud Analyzer* .........................................................18

Cellebrite, *Unlock Digital Intelligence* (2015).......................................18

Chad Haddal, *Border Security: Key Agencies and Their Missions*, Congressional Research Service (Jan. 26, 2010).......................................14

Department of Homeland Security, *Privacy Impact Assessment for the TECS System: CBP Primary and Secondary Processing* (Dec. 22, 2010) ...................24

DHS, Privacy Impact Assessment for the Border Searches of Electronic Devices (Aug. 25, 2009)...........................................................................21

EFF, *CBP Data Extraction Release* .......................................................18

Ericsson, *Ericsson Mobility Report* (June 2015).......................................5

FBI, Federal Business Opportunities, *Notice of Intent to Sole Source*, (Aug. 28, 2013).................................................................................18

Fitbit, *Surge specs* ...............................................................................7

Garmin, *Drive Product Line*..................................................................8

Google, *About Chromebook*...................................................................9

Google, *Maps* .....................................................................................17

Letter from Shari Suzuki, Customs and Border Protection, to Mark Rumold, Electronic Frontier Foundation (May 14, 2012)....................................18

Mint, *All in One*..................................................................................8

National Institute of Standards and Technology, Special Pub. 800-145, *The NIST Definition of Cloud Computing*, Special Publication (Sept. 2011) ........................8

Nest, Meet the Nest Cam Indoor Security Camera ..................................................8

Nissan, *NissanConnect Navigation System Features* ...............................................8

Pew Research Center, *Mobile Technology Fact Sheet* ..........................................5, 6

PwC Strategy&, *Connected Car Report 2016: Opportunities, Risk, and Turmoil on the Road to Autonomous Vehicles* (Sept. 28, 2016) ....................8

Stephen Lawson, Future of Mobile Phones Is in the Cloud, Ex-Nokia CTO Says, InfoWorld (April 16, 2009) .......................................................................................9

U.S. Sentencing Commission, *Overview of Federal Criminal Cases Fiscal Year 2014* .......................................................................................................................26

Uber, *Getting a trip receipt* .....................................................................................9

*UFED Physical Analyzer* ........................................................................................17

*United States Attorney's Annual Statistical Report Fiscal Year 2014* ...................26

WhatsApp, *Security* ..................................................................................................9

# STATEMENT OF INTEREST[1]

*Amici curiae* Electronic Frontier Foundation,[2] Asian Americans Advancing

Justice-Asian Law Caucus,[3] Council on American-Islamic Relations (CAIR),[4]

CAIR California,[5] CAIR Florida, Inc.,[6] CAIR New York,[7] CAIR Ohio,[8] and The

National Association of Criminal Defense Lawyers[9] are nonprofit public interest

organizations that work to protect civil liberties. *Amici curiae* advocate for the

constitutional right to privacy, including at the U.S. border.

---

[1] No party's counsel authored this brief in whole or in part. Neither any party nor any party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than *amici*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief. The defendant consented and the government is not opposed to the filing of this brief.

[2] eff.org.

[3] advancingjustice-alc.org.

[4] cair.com.

[5] ca.cair.com.

[6] cairflorida.org.

[7] cair-ny.org.

[8] cairohio.com.

[9] nacdl.org.

## INTRODUCTION

The Fourth Amendment's border search exception, permitting warrantless and suspicionless "routine" searches of belongings and persons at the U.S. border, should not apply to digital devices like Ms. Molina-Isidoro's cell phone. All border searches of the data stored or accessible on digital devices—whether "manual" or "forensic"—are "non-routine" and thus fall outside the border search exception. This is because *any search* of digital data is a "highly intrusive" search that implicates the "dignity and privacy interests" of the traveler. *U.S. v. Flores-Montano*, 541 U.S. 149, 152 (2004). Under the Supreme Court's ruling in *Riley v. California,* 134 S. Ct. 2473 (2014), border agents should be required to obtain a probable cause warrant to search the data stored or accessible on a digital device.

The *Riley* Court presented an analytical framework that complements the border search doctrine's traditional consideration of whether a search is "routine" or "non-routine." The Court explained that, in determining whether to apply an existing exception to the warrant and probable cause requirements to a "particular category of effects" such as cell phones, individual privacy interests must be balanced against legitimate governmental interests. *Id.* at 2484. The government's interests are analyzed by considering whether a search conducted without a warrant and probable cause is sufficiently "tethered" to the purposes underlying the exception. *Id.* at 2485. In the case of digital data at the border, not only are

individual privacy interests at their highest in devices such as cell phones and laptops, searches of digital devices without a warrant and probable cause are not sufficiently "tethered" to the narrow purposes justifying the border search exception: immigration and customs enforcement.

However, even if such "tethering" may be considered sufficient—meaning that there is a clear nexus between enforcing the immigration and customs laws, and conducting searches of digital devices at the border without a warrant and probable cause—the extraordinary privacy interests that travelers have in their cell phones and laptops outweigh any legitimate governmental interests. Prior to the rise of mobile computing, the "amount of private information carried by international travelers was traditionally circumscribed by the size of the traveler's luggage or automobile." *U.S. v. Cotterman*, 709 F.3d 952, 964 (9th Cir. 2013) (en banc). Today, however, the "sum of an individual's private life" sits in the pocket or purse of any traveler carrying a cell phone, laptop or other digital device. *Riley*, 134 S. Ct. at 2489.

The district court below stated, "Were this Court free to decide this matter in the first instance, it might prefer that a warrant be required to search an individual's cell phone at the border." *U.S. v. Molina-Isidoro*, 2016 WL 8138926, *8 (W.D. Tex. Oct. 7, 2016) (citing *U.S. v. Caballero*, 178 F. Supp. 3d 1008, 1016-17 (S.D. Cal. 2016)). Yet the district court felt bound by Fifth Circuit precedent

and declined to apply *Riley* to the border context or even "to decide whether the search of an individual's cell phone is a routine or nonroutine border search." *Id.*

However, a "person's digital life ought not to be hijacked simply by crossing a border." *Cotterman*, 709 F.3d at 965. This Court should take the step that the district court felt it could not take. *Amici* urge this Court to hold that all border searches of the data stored or accessible on digital devices are "non-routine," and thus, consistent with *Riley*, a probable cause warrant is required.[10]

## ARGUMENT

### I.  Digital Devices Contain and Access Vast Amounts of Highly Personal Information

Before digital devices came along, border searches of personal property, like searches incident to arrest, were "limited by physical realities and tended as a general matter to constitute only a narrow intrusion on privacy." *Riley*, 134 S. Ct. at 2489. In *Riley*, the government argued that a search of cell phone data is the same as a search of physical items, and so a cell phone should fall within the search-incident-to-arrest exception, which would permit the warrantless and suspicionless search of an arrestee's cell phone. *Id.* at 2488. The Court rejected this

---

[10] After the district court opinion below, a separate panel of the Fifth Circuit issued an unpublished, *per curiam* opinion in *U.S. v. Escarcega*, 2017 WL 1380555 (5th Cir. 2017), upholding a warrantless border search of the defendant's cell phone. The court's one-page opinion did not address the facts and law set forth in this brief. *Amici* urge the present panel to conduct its own analysis of the Fourth Amendment's applicability to digital devices at the border.

argument: "That is like saying a ride on horseback is materially indistinguishable from a flight to the moon." *Id. See also U.S. v. Kim*, 103 F. Supp. 3d 32, 55 (D.D.C. 2015) (in a border search case, stating *Riley* "strongly indicate[d] that a digital data storage device cannot fairly be compared to an ordinary container when evaluating the privacy concerns involved"). The Court examined the nature of cell phones themselves—rather than how the devices are searched—and concluded they are "not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life.'" *Riley*, 134 S. Ct. at 2494-95 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)).

Most people carry portable digital devices. Cell phones in particular have become "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley*, 134 S. Ct. at 2484. Globally, there are 7.5 billion cell phone subscriptions, including 3.9 billion for a smartphone.[11] Ninety-five percent of American adults own a cell phone, with 77 percent owning a smartphone.[12] Additionally, 22 percent

---

[11] Ericsson, *Ericsson Mobility Report* (June 2017), https://www.ericsson.com/assets/local/mobility-report/documents/2017/ericsson-mobility-report-june-2017.pdf.
[12] Pew Research Center, *Mobile Technology Fact Sheet* (Jan. 12, 2017), http://www.pewinternet.org/fact-sheets/mobile-technology-fact-sheet/.

of American adults own an e-reader and 51 percent own a tablet computer.[13] As the Supreme Court stated, "Prior to the digital age, people did not typically carry a cache of sensitive personal information with them as they went about their day. Now it is the person who is not carrying a cell phone, with all that it contains, who is the exception." *Riley*, 134 S. Ct. at 2490.

Digital devices are both quantitatively and qualitatively different from physical containers like luggage. *Id.* at 2489. Quantitatively, the vast amount of personal data on digital devices at the border is the same as if "a person's suitcase could reveal not only what the bag contained on the current trip, but everything it had ever carried." *Cotterman*, 709 F.3d at 965. *See also U.S. v. Saboonchi*, 48 F.Supp.3d 815, 819 (*Saboonchi II*) (stating "the sheer quantity of information available on a cell phone makes it unlike other objects to be searched"). With their "immense storage capacity," cell phones, laptops, tablets and other digital devices can contain the equivalent of "millions of pages of text, thousands of pictures, or hundreds of videos." *Riley*, 134 S. Ct. at 2489. *See also Cotterman*, 709 F.3d at 964 ("The average 400-gigabyte laptop hard drive can store over 200 million pages—the equivalent of five floors of a typical academic library.").

Qualitatively, digital devices "collect[] in one place many distinct types of information … that reveal much more in combination than any isolated record."

---

[13] *Id.*

*Riley*, 134 S. Ct. at 2489. They "are simultaneously offices and personal diaries" and "contain the most intimate details of our lives." *Cotterman*, 709 F.3d at 964. "Even the most basic phones that sell for less than $20 might hold photographs, picture messages, text messages, Internet browsing history, a calendar, a thousand-entry phone book, and so on." *Riley*, 134 S. Ct. at 2489. Also, "[h]istoric location information is a standard feature on many smartphones and can reconstruct someone's specific movements down to the minute, not only around town but also within a particular building." *Id.* at 2490 (citing *U.S. v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring) ("GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations.")).

Even digital devices with more limited features and storage capacity than cell phones and laptop computers contain a wide variety of highly personal information. Wearable fitness devices track a variety of data related to an individual's health.[14] E-readers can reveal every book a person has read.[15]

---

[14] For example, FitBit's Surge records steps, distance, floors climbed, calories burned, active minutes, workouts, sports played, sleep, and heart rate. It also records non-health information including the user's GPS location, and call and text notifications. *See* Fitbit, *Surge specs*, *https*://www.fitbit.com/surge.

[15] For example, Amazon's Kindle "holds thousands of books" as well as personal documents. *See* Amazon, *Kindle compare*, http://www.amazon.com/dp/B00I15SB16/ref=nav_shopall_k_ki#kindle-compare.

Dedicated GPS devices, including car navigation systems, show where someone has traveled and store the addresses of personal associates or favorite destinations.[16]

Importantly, many digital devices, including Ms. Molina-Isidoro's cell phone, permit access to personal information stored in the "cloud"—that is, not on the devices themselves, but on servers accessible via the Internet.[17] Thus, border agents can get a comprehensive look at a traveler's financial life with smartphone or tablet applications ("apps") that link to bank, credit card, and retirement accounts, as well as monthly bills.[18] Or they can see inside a traveler's home via live video feeds provided by home security apps.[19] Some digital devices already

---

[16] *See, e.g.*, Garmin, *Drive Product Line*, http://www8.garmin.com/automotive/pdfs/drive.pdf; Nissan, *NissanConnect Navigation System Features*, https://www.nissanusa.com/connect/features-app/navigation-system. Additionally, the next generation of "connected cars"—with Internet access, and a variety of sensors and features—promise to be a treasure trove of data on drivers and their passengers. *See, e.g.,* PwC Strategy&, *Connected Car Report 2016: Opportunities, Risk, and Turmoil on the Road to Autonomous Vehicles* (Sept. 28, 2016), http://www.strategyand.pwc.com/reports/connected-car-2016-study.

[17] *See* National Institute of Standards and Technology, Special Pub. 800-145, *The NIST Definition of Cloud Computing* (Sept. 2011), http://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-145.pdf.

[18] *See, e.g.*, Mint, *All in One*, https://www.mint.com/how-mint-works.

[19] See, e.g., Nest, Meet the Nest Cam Indoor Security Camera, https://nest.com/camera/meet-nest-cam/.

store virtually all data in the cloud,[20] and some analysts predict this will become

ubiquitous.[21] Because cloud data can "appear as a seamless part of the digital

device when presented at the border," *Cotterman*, 709 F.3d at 965, border agents

"would not typically know whether the information they are viewing was stored

locally … or has been pulled from the cloud," *Riley*, 134 S. Ct. at 2491. In this

case, border agents accessed Ms. Molina-Isidoro's cloud data: they opened her

Uber and WhatsApp cell phone apps, which store user data remotely on the

companies' servers.[22] There is no indication that border agents put her phone in

airplane mode or otherwise disconnected it from the Internet when they accessed

these apps.[23]

---

[20] *See, e.g.*, Google, *About Chromebook* ("Gmail, Maps, Docs and pics [are] safely stored in the cloud, so a laptop spill really is just a laptop spill"), https://www.google.com/chromebook/about/.

[21] See, e.g., Stephen Lawson, Future of Mobile Phones Is in the Cloud, Ex-Nokia CTO Says, InfoWorld (April 16, 2009) ("The standard architecture that will realize the promise of mobile phones won't be hardware or software but a cloud-based platform…."), http://www.infoworld.com/article/2631862/mobile-apps/future-of-mobile-phones-is-in-the-cloud--ex-nokia-cto-says.html

[22] For example, if a phone is in airplane mode, the Uber app will not load the user's trip history stored on Uber's servers. *See generally* Uber, *Getting a trip receipt*, https://help.uber.com/h/846f6cad-6f27-492a-9e0b-d2f056e1298e. And while WhatsApp "doesn't store your messages on our servers once we deliver them," if the app is open and connected to the Internet, any new messages that are delivered are pulled from WhatsApp's servers. *See* WhatsApp, *Security*, https://www.whatsapp.com/security/.

[23] CBP recently announced that border agents may not access cloud data when searching a digital device. E.D. Cauchi, *Border Patrol Says It's Barred From Searching Cloud Data on Phones*, NBC News (July 12, 2017), http://www.nbcnews.com/news/us-news/border-patrol-says-it-s-barred-searching-

Therefore, today's digital devices enable the reconstruction of "the sum of an individual's private life" covering a lengthy amount of time—"back to the purchase of the [device], or even earlier." *Riley*, 134 S. Ct. at 2489. While people cannot physically "lug around every piece of mail they have received for the past several months, every picture they have taken, or every book or article they have read," they now do so digitally. *Id.* at 2489. *See also Cotterman*, 709 F.3d at 965 (stating "digital devices allow us to carry the very papers we once stored at home"). But it is not just that a phone "contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is." *Riley*, 134 S. Ct. at 2491.

In sum, portable digital devices differ wildly from luggage and other physical items a person possesses when entering or leaving the country. Now is the time to acknowledge the full force of the privacy implications of border searches of digital devices. As the Supreme Court said, "It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology." *Kyllo v. U.S.*, 533 U.S. 27, 33-34

---

cloud-data-phones-n782416. *Amici* are aware of no such policy at the time of the border search at issue here (July 2016). Indeed, media reports indicate that border agents commonly search cloud data when searching digital devices. EFF, *CBP Responds to Sen. Wyden: Border Agents May Not Search Travelers' Cloud Content* (July 17, 2017), https://www.eff.org/deeplinks/2017/07/cbp-responds-sen-wyden-border-agents-may-not-search-travelers-cloud-content.

(2001). Thus, "the rule we adopt must take account of more sophisticated systems that are already in use or in development." *Id.* at 36.

## II.    The Border Search Exception Is Narrow

"[T]he ultimate touchstone of the Fourth Amendment is reasonableness." *Riley*, 134 S. Ct. at 2482. Normally, reasonableness requires a warrant based on probable cause. *Id.* (citing *Vernonia School District 47J v. Acton*, 515 U.S. 646, 653 (1995)). However, *in limited circumstances*, neither a warrant nor probable cause is required when the "primary purpose" of a search is "beyond the normal need for law enforcement" or "beyond the general interest in crime control." *Vernonia*, 515 U.S. at 653; *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 48 (2000). Crucially, searches without a warrant and probable cause (including *suspicionless* searches) under these limited exceptions must be "tethered" to the purposes justifying the exception. *Riley*, 134 S. Ct. at 2485 (citing *Arizona v. Gant*, 556 U.S. 332, 343 (2009)). *See also Florida v. Royer*, 460 U.S. 491, 500 (1983) (warrantless searches "must be limited in scope to that which is justified by the particular purposes served by the exception").

The search-incident-to-arrest exception at issue in *Riley* is not justified by the need to gather additional evidence of the alleged crime, but instead the need to protect officer safety and prevent the destruction of evidence. *Riley*, 134 S. Ct. at 2483 (citing *Chimel v. California*, 395 U.S. 752 (1969)). The warrantless and

suspicionless drug tests at issue in *Vernonia* were upheld as reasonable to protect the health and safety of minor student athletes. 515 U.S. at 665. Warrantless and suspicionless sobriety checkpoints are reasonable because they advance the non-criminal purpose of roadway safety. *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444 (1990). By contrast, the warrantless and suspicionless vehicle checkpoint in *Edmond* to uncover illegal narcotics was unconstitutional because its primary purpose was to "uncover evidence of ordinary criminal wrongdoing." *Edmond*, 531 U.S. at 42.

The border search exception permits warrantless and suspicionless "routine" searches of individuals and items in their possession when crossing the U.S. border. *U.S. v. Montoya de Hernandez*, 473 U.S. 531 (1985). *Edmond* clarified that although some exceptions, like border searches, might involve law enforcement activities because they can result in "arrests and criminal prosecutions," that does not mean that the exceptions were "designed primarily to serve the general interest in crime control." 531 U.S. at 42. Rather, the border search exception is intended to serve the narrow purposes of enforcing the immigration and customs laws. *See Cotterman*, 709 F.3d at 956 (emphasizing the "narrow" scope of the border search exception).

In 1925, the Supreme Court articulated these two limited justifications for warrantless and suspicionless searches at the border: "Travelers may be so stopped

in crossing an international boundary because of national self-protection

reasonably requiring one entering the country to identify [i] himself as *entitled* to

come in, and [ii] his belongings as effects which may be *lawfully* brought in."

*Carroll v. U.S.*, 267 U.S. 132, 154 (1925) (emphasis added). *Carroll* relied on

*Boyd*, which drew a clear distinction between searches and seizures consistent with

the purposes of the border search exception—in particular, enforcing customs

laws—and those to obtain evidence for a criminal case:

> The search for and seizure of … goods liable to duties and concealed
> to avoid the payment thereof, are totally different things from a search
> for and seizure of a man's private books and papers for the purpose of
> obtaining information therein contained, or of using them as evidence
> against him.

116 U.S. at 623.

Accordingly, under the immigration and customs rationales, the border

search exception permits warrantless and suspicionless "routine" searches in order

to prevent undocumented immigrants from entering the country, *Almeida-Sanchez

v. U.S.*, 413 U.S. 266, 272 (1973), and to enforce the laws regulating the

importation or exportation of goods, including ensuring that duties are paid on

those goods, *Boyd*, 116 U.S. at 624. The border search exception may also be

invoked to prevent the importation of contraband such as drugs, weapons,

agricultural products, and other items that could harm individuals or industries if

brought into the country. *See Montoya de Hernandez*, 473 U.S. at 537 (discussing

"the collection of duties and … prevent[ing] the introduction of contraband into this country").[24]

While the Supreme Court in *U.S. v. Ramsey* stated that "searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border," 431 U.S. 606, 616 (1977), the Court's reliance on *Boyd* and *Carroll* shows that the Court understood that this government power must remain tethered to the specific and narrow purposes of enforcing the immigration and customs laws. *Id.* at 617-19. This parallels both *Chimel* and *Riley*, which held that searches of a home and cell phone data, respectively, were outside the scope of the narrow purposes of the search-incident-to-arrest exception. *See Riley*, 134 S. Ct. at 2483 (citing *Chimel*, 395 U.S. at 753-54, 762-63).

Therefore, it is not "anything goes" at the border. *U.S. v. Seljan*, 547 F.3d 993, 1000 (9th Cir. 2008) (en banc). Rather, the Fourth Amendment requires that border searches without a warrant and probable cause must be "tethered" to

---

[24] *See also* Chad Haddal, Cong. Research Serv., 7-5700, *Border Security: Key Agencies and Their Missions*, 2 (Jan. 26, 2010) ("CRS Report") ("CBP's mission is to prevent terrorists and terrorist weapons from entering the country, provide security at U.S. borders and ports of entry, apprehend illegal immigrants, stem the flow of illegal drugs, and protect American agricultural and economic interests from harmful pests and diseases."),
https://www.fas.org/sgp/crs/homesec/RS21899.pdf.

enforcing the immigration and customs laws.

### III.    All Border Searches of Digital Data, Whether "Manual" or "Forensic," are Highly Intrusive of Personal Privacy and Are Thus "Non-Routine"

Not all border searches are "routine." In *Ramsey*, the Supreme Court made

clear that the Constitution restricts the border search exception: "The border-search

exception is grounded in the recognized right of the sovereign to control, *subject to*

*substantive limitations imposed by the Constitution*, who and what may enter the

country." 431 U.S. at 620 (emphasis added). The Court has defined "non-routine"

border searches as "highly intrusive" or those that impact the "dignity and privacy

interests" of travelers, *Flores-Montano*, 541 U.S. at 152, or are carried out in a

"particularly offensive manner," *Ramsey*, 431 U.S. at 618 n.13. Thus, in *Montoya*

*de Hernandez*, the Supreme Court held that detaining a traveler until she defecated

to see if she was smuggling drugs in her digestive tract was a "non-routine" seizure

and search that required reasonable suspicion. 473 U.S. at 541.

Some courts have concluded that only "forensic" searches of digital data are

"non-routine" (and thus require reasonable suspicion), while "manual" searches of

the same data are "routine" and fall within the border search exception. *See, e.g.*,

*Cotterman*, 709 F.3d at 967-68; *U.S. v. Kolsuz*, 185 F.Supp.3d 843, 858 (E.D. Va.

2016); *U.S. v. Saboonchi*, 990 F.Supp.2d 536, 547-48 (D. Md. 2014) (*Saboonchi*

*I*). In this case, the district court acknowledged *Riley*'s conclusion that "[m]odern

cell phones, as a category, implicate privacy concerns far beyond those implicated

by the search of a … wallet, or a purse." *Molina-Isidoro*, 2016 WL 8138926, *at* *4. Unfortunately, the district court declined "to decide whether the search of an individual's cell phone is a routine or nonroutine border search." *Id.* at *8.

However, *any* search of the data stored or accessible on a digital device—whether manually or with specialized "forensic" tools—is a "highly intrusive" search that implicates the "dignity and privacy interests" of the traveler, or may be considered "particularly offensive," and thus is "non-routine." *Flores-Montano*, 541 U.S. at 152.

Given the vast amount of highly personal information that digital devices contain, as well as their ability to connect to sensitive data in the cloud, "manual" searches of digital devices at the border greatly burden privacy interests in ways that searches of luggage do not. *See Saboonchi I*, 990 F.Supp.2d at 547 (acknowledging that "a conventional computer search can be deeply probing"). "Manual" searches of digital data can access emails, voicemails, text messages, call logs, contact lists, photographs, videos, calendar entries, shopping lists, personal notes, and web browsing history, as well as cloud data via apps. While the search of Ms. Molina-Isidoro's cell phone was "manual," it focused on her WhatsApp and Uber apps, both of which can connect to data stored in the cloud. *Molina-Isidoro*, 2016 WL 8138926, *at* *2. Even a history of a traveler's physical location may be uncovered through a "manual" search: for example, on an iPhone,

a user may have toggled on the "Frequent Locations" feature.[25] Or, if a traveler

uses Google Maps while logged into their Google account, a "manual" search of

the app would reveal the traveler's navigation history.[26] As the cost of storage

drops and technology advances, digital devices will hold ever greater amounts of

personal information and feature increasingly powerful search capabilities.[27] Thus,

"manual" searches will reveal ever more personal information, making the

distinction between them and "forensic" searches even more meaningless.

Additionally, new technology enables border agents to quickly conduct

"forensic" searches at the border itself. This empowers the government to invade

the digital privacy of ever growing numbers of travelers. For example, Cellebrite

manufactures several Universal Forensic Extraction Devices ("UFEDs") that plug

into cell phones, laptops, tablets and other mobile devices and enable the quick and

easy extraction of detailed digital data.[28] UFEDs also enable access to social media

accounts and other cloud content, which the company describes as "a virtual

---

[25] To change iOS 10 settings go to Settings>Privacy>Location Services>System Services>Frequent Locations.

[26] *See* Google, *Maps*, https://www.google.com/maps/.

[27] Apple's iPhone currently has a search function for the entire phone that pulls content based on keywords. Apple, *Use Search on Your iPhone, iPad, or iPod Touch*, https://support.apple.com/en-us/HT201285.

[28] *See* Cellebrite, *Mobile Forensics Products*, http://www.cellebrite.com/Mobile-Forensics/Products; Cellebrite, *UFED Physical Analyzer*, http://www.cellebrite.com/Mobile-Forensics/Applications/ufed-physical-analyzer; Cellebrite, *iOS Forensics: Physical Extraction, Decoding and Analysis From iOS Devices*, http://www.cellebrite.com/Pages/ios-forensics-physical-extraction-decoding-and-analysis-from-ios-devices.

goldmine of potential evidence for forensic investigators."[29] UFEDs are small and portable, enabling "simple, real-time extractions onsite."[30] A UFED can extract eight gigabytes of data from an Apple iPhone in a "mere 20 minutes," while its search functions cut the search time "from days to minutes."[31] CBP is already using UFEDs.[32] In training materials, the agency lauds the devices' portability and ease of use in the field, stressing that no computer is needed to extract data like call logs, videos, pictures, and text messages.[33] The FBI also uses UFEDs and prefers this technology due to its "extraction speed and intuitive user interface."[34]

Thus, the rapid rate of technological change belies any suggestion, based on

---

[29] Cellebrite, *UFED Cloud Analyzer*, http://www.cellebrite.com/Mobile-Forensics/Products/ufed-cloud-analyzer.

[30] Cellebrite, *Unlock Digital Intelligence*, 3 (2015), http://www.cellebrite.com/Media/Default/Files/Forensics/Solution-Briefs/Mobile-Forensics-Solution-Brief.pdf.

[31] Cellebrite, *Case Study: Cellebrite Certification Training Helps NY Agency Maximize UFED Usage*, 1, http://www.cellebrite.com/Media/Default/Files/Forensics/Case-Studies/Cellebrite-Certification-Training-Helps-NY-Agency-Maximize-UFED-Usage_Case%20Study.pdf.

[32] CBP, Federal Business Opportunities, *UFED Kits, Software Updates* (Sept. 4, 2013), https://www.fbo.gov/index?s=opportunity&mode=form&tab=core&id=44c0118f0eea7370c6eb1d5a8bf711d7; Letter from Shari Suzuki, CBP, to Mark Rumold, EFF (May 14, 2012), https://www.eff.org/files/filenode/foia__20120808155244.pdf,

[33] EFF, *CBP Data Extraction Release*, 31, 33, https://www.eff.org/document/cbp-data-extraction-release.

[34] FBI, Federal Business Opportunities, *Notice of Intent to Sole Source* (Aug. 28, 2013), https://www.fbo.gov/index?s=opportunity&mode=form&id=e3742ca87da9650f719e902f86ad36b6&tab=core&_cview=0.

much more primitive technology, that "[c]ustoms agents have neither the time nor the resources to search the contents of every computer." *U.S. v. Ickes*, 393 F.3d 501, 507 (4th Cir. 2005). As the Ninth Circuit noted, "It is the *potential* unfettered dragnet effect that is troublesome." *Cotterman*, 709 F.3d at 966 (emphasis added).

Therefore, the dichotomy between "manual" and "forensic" searches is factually meaningless and constitutionally unworkable. Constitutional rights should not turn on such a flimsy distinction. *See Kim*, 103 F. Supp. 3d at 55 (stating that whether the border search of the defendant's laptop was reasonable does not "turn on the application of an undefined term like 'forensic'"). Importantly, *Riley* did not distinguish between how digital devices are searched. Even though the searches in *Riley* were *manual* searches (like the search of Ms. Molina-Isidoro's cell phone), the Court required a probable cause warrant for *all searches* of a cell phone seized incident to an arrest. *Riley*, 134 S. Ct. at 2480-81, 2493.

In sum, all searches of digital data at the border are "non-routine" and thus fall outside the border search exception because the government's conduct is the same: accessing to an unprecedented degree tremendous amounts of highly personal information. *See Flores-Montano*, 541 U.S. at 154 n.2 ("We again leave open the question 'whether, and under what circumstances, a border search might be deemed 'unreasonable' because of the particularly offensive manner in which it

is carried out.'").

## IV.   A Probable Cause Warrant Should Be Required for Border Searches of Data Stored or Accessible on Digital Devices

The Supreme Court prefers "clear guidance" and "categorical rules." *Riley*, 134 S. Ct. at 2491. The *Riley* Court's analytical framework complements the border search doctrine's traditional consideration of whether a search is "routine" or "non-routine." In determining whether to apply an existing exception to the warrant and probable cause requirements to a "particular category of effects," individual privacy interests must be balanced against legitimate governmental interests. *Riley*, 134 S. Ct. at 2484. In the case of border searches of digital devices, this balancing clearly tips in favor of the traveler. Given that *Ramsey* noted the similarity between the border search exception and the search-incident-to-arrest exception, 431 U.S. at 621, this Court should adopt the clear rule that *all* border searches of data stored or accessible on digital devices are "non-routine" searches that require a probable cause warrant.[35]

Border agents may still benefit from the border search exception: for example, they can search without a warrant or individualized suspicion the

_____

[35] While the Supreme Court's border search cases have not required more than reasonable suspicion for "non-routine" searches, the Court has never said that reasonable suspicion is the absolute upper limit for searches conducted at the border. *See, e.g.*, *Montoya de Hernandez* 473 U.S. at 541 n.4 ("[W]e suggest no view on what level of suspicion, if any, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches.").

"physical aspects" of a digital device to ensure that it does not contain contraband such as drugs or explosives. *See Riley*, 134 S. Ct. at 2485. Moreover, any concerns that a warrant is difficult to obtain at the border should be allayed given that "[r]ecent technological advances … have … made the process of obtaining a warrant itself more efficient." *Riley*, 134 S. Ct. at 2493.[36]

## A.     A Probable Cause Warrant Should Be Required Given the Highly Personal Information Stored and Accessible on Digital Devices

Modern digital devices like cell phones and laptops reveal the "sum of an individual's private life," *Riley*, 134 S. Ct. at 2489, making any search by the government an unprecedented intrusion into individual privacy. Any border search of a digital device is highly intrusive and "bears little resemblance" to searches of travelers' luggage. *Id.* at 2485. Even DHS acknowledges that "a search of [a] laptop increases the possibility of privacy risks due to the vast amount of information potentially available on electronic devices."[37]

The fact that luggage may contain physical items with personal information does not negate the unique privacy interests in digital devices. A few letters in a suitcase do not compare to the detailed record of correspondence over months or

---

[36] Border agents clearly have the ability to seek and obtain judicial authorization for "non-routine" searches and seizures. *See, e.g., Montoya de Hernandez*, 473 U.S. at 535 ("[C]ustoms officials sought a court order authorizing a pregnancy test, an [x-ray], and a rectal examination.").

[37] DHS, Privacy Impact Assessment for the Border Searches of Electronic Devices, 2 (Aug. 25, 2009), http://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_cbp_laptop.pdf.

years that a digital device may contain and even a "manual" search would reveal.

Also, paper diaries do not have a keyword search function and people do not carry

all the diaries they have ever owned when they travel. The *Riley* Court stated:

> [T]he fact that a search in the pre-digital era could have turned up a photograph or two in a wallet does not justify a search of thousands of photos in a digital gallery. The fact that someone could have tucked a paper bank statement in a pocket does not justify a search of every bank statement from the last five years. And to make matters worse, such an analogue test would allow law enforcement to search a range of items contained on a phone, even though people would be unlikely to carry such a variety of information in physical form.

134 S. Ct. at 2493.

The district court acknowledged *Riley*'s conclusion that "[m]odern cell

phones, as a category, implicate privacy concerns far beyond those implicated by

the search of a … wallet, or a purse." *Molina-Isidoro*, 2016 WL 8138926, *at* *4.

Thus, the district court stated, "Were this Court free to decide this matter in the

first instance, it might prefer that a warrant be required to search an individual's

cell phone at the border." *Id.* at *8.

Nevertheless, the district court, feeling constrained by Fifth Circuit

precedent, stated that it would require no more than reasonable suspicion at the

border. *Id.* at *6. However, the reasonable suspicion standard insufficiently

protects Fourth Amendment rights in this context. The proper level of

constitutional protection is a probable cause warrant.

**B.    A Probable Cause Warrant Should Be Required Because Searching Digital Data Is Not Tethered to the Narrow Purposes of the Border Search Exception**

Under the *Riley* balancing test, the government's interests are analyzed by considering whether a search conducted without a warrant or probable cause is "tethered" to the purposes underlying the exception. 134 S. Ct. at 2485. In the case of digital data at the border, searches of digital devices without a warrant and probable cause are not sufficiently "tethered" to the narrow purposes justifying the border search exception: immigration and customs enforcement. As with the search-incident-to-arrest exception, the border search exception might "strike[] the appropriate balance in the context of physical objects," but its underlying rationales do not have "much force with respect to digital content on cell phones" or other digital devices. *Id.* at 2484 (citing *U.S. v. Robinson*, 414 U.S. 218 (1973)).

In creating the categorical rule that the search-incident-to-arrest exception does not extend to digital devices like cell phones, the *Riley* Court found that searches without a warrant and probable cause of data on digital devices seized following an arrest are not sufficiently "tethered" to the narrow purposes of the search-incident-to-arrest exception: to protect officers from an arrestee who might grab a weapon, and to prevent the arrestee from destroying evidence. *Id.* at 2483, 2485-86. The Court stated that "data on the phone can endanger no one," and the probabilities are small that associates of the arrestee will remotely delete digital

data or that an officer will discover an unlocked phone in time to thwart a password lock or encryption. *Id.* at 2485-88. The Court concluded that neither "problem is prevalent," and therefore their possibilities do not justify embodying such a significant privacy invasion within a categorical rule—that is, permitting a warrantless search of a cell phone *for every arrest. Id.*

Likewise, searches of digital devices at the border without a warrant and probable cause are not sufficiently "tethered" to the narrow purposes of enforcing the immigration and customs laws.

Border agents determine a traveler's immigration status and authority to enter the United States, not by inspecting the personal data on a digital device, but rather by inspecting official documents such as a passport or visa, and by consulting government databases that contain additional information such as outstanding arrest warrants and watchlist designations.[38]

Border agents enforce customs laws by interviewing travelers, examining their luggage or vehicles, and if necessary, their persons. The traditional purpose of the customs rationale of the border search exception is to prevent physical items from entering (or leaving) the country at the moment the traveler crosses the

---

[38] *See* CRS Report at 2 ("CBP inspectors enforce immigration law by examining and verifying the travel documents of incoming international travelers to ensure they have a legal right to enter the country."); DHS, *Privacy Impact Assessment for the TECS System: CBP Primary and Secondary Processing,* 8 (Dec. 22, 2010), http://www.dhs.gov/xlibrary/assets/privacy/privacy-pia-cbp-tecs.pdf.

border, typically because the items were not properly declared for duties, or are

contraband that could harm individuals or industries if brought into the country.

Just as the *Riley* Court stated that "data on the phone can endanger no one," 134 S.

Ct. at 2485, physical items cannot be hidden in digital data.

In this case, Ms. Molina-Isidoro is being prosecuted for attempting to import

methamphetamine into the country. *Molina-Isidoro*, 2016 WL 8138926, *2. While

drugs are physical items that were, in fact, found in Ms. Molina-Isidoro's luggage,

a warrantless search of Ms. Molina-Isidoro's cell phone is not sufficiently

"tethered" to enforcing laws against importing illegal drugs. As the district court

stated, a warrantless search of "the contents of a cell phone does not seem to

directly contribute to [one] justification for the border search exception—i.e.,

preventing the entry of unwanted illicit substances into the country." *Id.* at *8,

n.10. *See also Kolsuz*, 185 F. Supp. 3d at 858 (stating that digital data "is merely

indirect evidence of the things an individual seeks to export illegally—not the

things themselves—and therefore the government's interest in obtaining this

information is less significant than the government's interest in directly

discovering the items to be exported illegally," and "any digital information

contained on a cell phone that is relevant to exporting goods illegally can be easily

obtained once a border agent establishes some level of individualized suspicion").

Some digital content, such as child pornography, may be considered "digital

- 25 -

contraband" that may be interdicted at the U.S. border. *Cf. U.S. v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 376–77 (1971) ("Congress may declare [obscenity] contraband and prohibit its importation."). However, the government has not demonstrated that "digital contraband"—unlike illegal drugs, for example—is a significant or "prevalent" problem *at the border* that justifies a *categorical rule* generally permitting border searches of digital devices absent a warrant and probable cause.[39] As the Ninth Circuit said, "legitimate concerns about child pornography do not justify unfettered crime-fighting searches or an unregulated assault on citizens' private information." *Cotterman*, 709 F.3d at 966.

Ultimately, even if "tethering" may be considered sufficient—meaning that there is a clear nexus between enforcing the immigration and customs laws, and conducting searches of digital devices at the border without a warrant and probable cause—the extraordinary privacy interests that travelers have in their cell phones and laptops still outweigh any legitimate governmental interests. Governmental

---

[39] Of the 56,218 criminal cases filed in federal court in the 2014 fiscal year, only 102 or 0.2 percent involved customs violations. *See* DOJ, *United States Attorney's Annual Statistical Report Fiscal Year 2014* 11-12, http://www.justice.gov/sites/default/files/usao/pages/attachments/2015/03/23/14sta trpt.pdf. In the 2014 fiscal year, child pornography made up only 2.5 percent of all federal "offenders" prosecuted and sentenced in federal court. *See* U.S. Sentencing Commission, *Overview of Federal Criminal Cases Fiscal Year 2014* 2 (Aug. 2015), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/ research-publications/2015/FY14_Overview_Federal_Criminal_Cases.pdf. This represents *all* child pornography offenders, not just those apprehended at the border.

interests do "not justify dispensing with the warrant requirement across the board."

*Riley*, 134 S. Ct. at 2486. "The Supreme Court has never endorsed the proposition

that the goal of deterring illegal contraband at the border suffices to justify any

manner of intrusive search." *Cotterman*, 709 F.3d at 967.

## CONCLUSION

This Court should adopt the categorical rule that all border searches of data

stored or accessible on digital devices are "non-routine," and thus, consistent with

*Riley v. California*, a probable cause warrant is required.


Dated: August 7, 2017

Respectfully submitted,

/s/ *Mitchell L. Stoltz*

| | |
|---|---|
| Mitchell L. Stoltz | Nicole DeBorde |
|    *Counsel of Record* | NATIONAL ASSOCIATION OF CRIMINAL |
| Sophia Cope | DEFENSE LAWYERS |
| Adam Schwartz | 712 Main Street, Suite 2400 |
| ELECTRONIC FRONTIER FOUNDATION | Houston, TX 77002 |
| 815 Eddy Street | (713) 526-6300 |
| San Francisco, California 94109 | |
| (415) 436-9333 | *Counsel for Amicus Curiae* |
| mitch@eff.org | *National Association of Criminal* |
| | *Defense Lawyers* |
| *Counsel for Amici Curiae* | |
| *EFF, AAAJ-ALC, CAIR,* | |
| *and four CAIR Chapters* | |

Cynthia Orr
National Association of Criminal
Defense Lawyers
Goldstein, Goldstein, Hilly & Orr
310 S. St. Mary's Street
29th Floor Tower Life Building
San Antonio, TX 78205
(210) 226-1463

*Counsel for Amicus Curiae National Association of Criminal Defense Lawyers*

Michelle Simpson Tuegel
National Association of Criminal
Defense Lawyers
Hunt & Tuegel PLLC
ALICO Building, Suite 1208
425 Austin Avenue
Waco, TX 76703
(254) 753-3738

*Counsel for Amicus Curiae National Association of Criminal Defense Lawyers*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE
REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(A)(7)(C)**

I hereby certify as follows:

1.      The foregoing Brief of *Amici Curiae* complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  The brief is printed in proportionally spaced 14-point type, and there are 6,311 words in the brief according to the word count of the word-processing system used to prepare the brief (excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)).

2.      The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and with the type style requirements of Fed. R. App. P. 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Mac 2011 in 14-point Times New Roman font.

Dated:  August 7, 2017                      /s/ *Mitchell L. Stoltz*
                                            Mitchell L. Stoltz

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeal for the Fifth Circuit by using the appellate CM/ECF System on August 7, 2017.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:   August 7, 2017                    /s/ *Mitchell L. Stoltz*
                                           Mitchell L. Stoltz

**Exhibit 3**

Case No. 17-50070

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MARIA ISABEL MOLINA-ISIDORO,

*Defendant-Appellant.*

---

## BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION, ASIAN AMERICANS ADVANCING JUSTICE-ASIAN LAW CAUCUS, COUNCIL ON AMERICAN-ISLAMIC RELATIONS (CAIR), CAIR CALIFORNIA, CAIR FLORIDA, CAIR NEW YORK, CAIR OHIO, AND THE NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS IN SUPPORT OF DEFENDANT-APPELLANT

---

On Appeal from the U.S. District Court for the Western District of Texas, El Paso
The Honorable Philip R. Martinez, U.S. District Court Judge
Case No. 3:16-cr-1402-1

---

Mitchell L. Stoltz
   *Counsel of Record*
Sophia Cope
Adam Schwartz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
(415) 436-9333
mitch@eff.org

*Counsel for Amici Curiae
EFF, AAAJ-ALC, CAIR,
and four CAIR Chapters*

Nicole DeBorde
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
712 Main Street, Suite 2400
Houston, TX 77002
(713) 526-6300

*Counsel for Amicus Curiae
National Association of Criminal
Defense Lawyers*

*(Additional counsel listed inside cover)*

Cynthia Orr
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
Goldstein, Goldstein, Hilly & Orr
310 S. St. Mary's Street
29th Floor Tower Life Building
San Antonio, TX 78205
(210) 226-1463

*Counsel for Amicus Curiae National
Association of Criminal Defense
Lawyers*

Michelle Simpson Tuegel
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
Hunt & Tuegel PLLC
ALICO Building, Suite 1208
425 Austin Avenue
Waco, TX 76703
(254) 753-3738

*Counsel for Amicus Curiae National
Association of Criminal Defense
Lawyers*

## SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

Pursuant to this Court's Rule 29.2, the undersigned counsel of record for *amici curiae* certify that the following additional persons and entities have an interest in the outcome of this case.

1.  Electronic Frontier Foundation, Asian Americans Advancing Justice-Asian Law Caucus, Council on American-Islamic Relations (CAIR), Council on American-Islamic Relations California, CAIR Florida, Inc., Council on American-Islamic Relations New York, Inc., Council on American-Islamic Relations Ohio, and The National Association of Criminal Defense Lawyers, *amici curiae. Amici curiae* are nonprofit organization recognized as tax exempt under Internal Revenue Code § 501(c)(3). They have no parent corporation and no publicly held corporation owns 10 percent or more of their stock.

2.  Mitchell L. Stoltz, attorney for *amici curiae.*

3.  Sophia Cope, attorney for *amici curiae.*


Dated:  August 28, 2017                    /s/ *Mitchell L. Stoltz*
                                                     Mitchell L. Stoltz

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES ......................... i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF INTEREST................................................................. 1

INTRODUCTION ................................................................................. 2

ARGUMENT....................................................................................... 4

    I.    Digital Devices Contain and Access Vast Amounts of Highly Personal Information ............................................................ 4

    II.    The Border Search Exception Is Narrow .......................................... 11

    III.    All Border Searches of Digital Data, Whether "Manual" or "Forensic," are Highly Intrusive of Personal Privacy and Are Thus "Non-Routine" ...................................................................... 15

    IV.    A Probable Cause Warrant Should Be Required for Border Searches of Data Stored or Accessible on Digital Devices................ 20

        A.   A Probable Cause Warrant Should Be Required Given the Highly Personal Information Stored and Accessible on Digital Devices ...... 21

        B.   A Probable Cause Warrant Should Be Required Because Searching Digital Data Is Not Tethered to the Narrow Purposes of the Border Search Exception ...................................................... 23

CONCLUSION.................................................................................... 27

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(A)(7)(C).................................... 29

CERTIFICATE OF SERVICE ................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*Almeida-Sanchez v. United States,*
  413 U.S. 266 (1973) ................................................................... 13

*Arizona v. Gant,*
  556 U.S. 332 (2009) ................................................................... 11

*Boyd v. United States,*
  116 U.S. 616 (1886) ......................................................... 5, 13, 14

*Carroll v. United States,*
  267 U.S. 132 (1925) ............................................................. 13, 14

*Chimel v. California,*
  395 U.S. 752 (1969) ............................................................. 11, 14

*City of Indianapolis v. Edmond,*
  531 U.S. 32 (2000) ............................................................... 11, 12

*Florida v. Royer,*
  460 U.S. 491 (1983) ................................................................... 11

*Kyllo v. United States,*
  533 U.S. 27 (2001) ..................................................................... 11

*Michigan Dept. of State Police v. Sitz,*
  496 U.S. 444 (1990) ................................................................... 12

*Riley v. California,*
  134 S.Ct. 2473 (2014) ........................................................*passim*

*U.S. v. Caballero,*
  178 F.Supp.3d 1008 (S.D. Cal. 2016) ....................................... 3

*U.S. v. Escarcega,*
  2017 WL 1380555 (5th Cir. 2017) ............................................ 4

*U.S. v. Kolsuz,*
  185 F.Supp.3d 843 (E.D. Va. 2016) ............................... 2, 15, 25

*U.S. v. Molina-Isidoro,*
    2016 WL 8138926 (W.D. Tex. Oct. 7, 2016) ..................................... 3, 16, 22, 25

*U.S. v. Montoya de Hernandez,*
    473 U.S. 531 (1985) ...............................................................*passim*

*U.S. v. Saboonchi,*
    990 F.Supp.2d 536 (D. Md. 2014) .............................................. 15, 16

*U.S. v. Thirty-Seven (37) Photographs,*
    402 U.S. 363 (1971) ................................................................... 26

*United States v. Cotterman,*
    709 F.3d 952 (9th Cir. 2013) ...................................................*passim*

*United States v. Flores-Montano,*
    541 U.S. 149 (2004) ........................................................ 2, 15, 16, 19

*United States v. Ickes,*
    393 F.3d 501 (4th Cir. 2005) ....................................................... 19

*United States v. Jones,*
    565 U.S. 400 (2012) ..................................................................... 7

*United States v. Kim,*
    103 F. Supp. 3d 32 (D.D.C. 2015) .............................................. 5, 19

*United States v. Ramsey,*
    431 U.S. 606 (1977) ........................................................ 14, 15, 20

*United States v. Robinson,*
    414 U.S. 218 (1973) ................................................................... 23

*United States v. Seljan,*
    547 F.3d 993 (9th Cir. 2008) ....................................................... 14

*Vernonia School District 47J v. Acton,*
    515 U.S. 646 (1995) ............................................................... 11, 12

## Other Authorities

Amazon, *Kindle compare* ........................................................................ 7

Apple, *Use Search on Your iPhone, iPad, or iPod Touch* ..................................... 17

CBP, Federal Business Opportunities, *UFED Kits, Software Updates*
(Sept. 4, 2013) ........................................................................... 18

Cellebrite, Case Study: Cellebrite Certification Training Helps NY Agency
Maximize UFED Usage ............................................................ 18

Cellebrite, *iOS Forensics: Physical Extraction, Decoding and Analysis From
iOS Devices* ............................................................................ 17

Cellebrite, *Mobile Forensics Products* ................................................. 17

Cellebrite, *UFED Cloud Analyzer* ....................................................... 18

Cellebrite, *Unlock Digital Intelligence* (2015) ....................................... 18

Chad Haddal, *Border Security: Key Agencies and Their Missions*, Congressional
Research Service (Jan. 26, 2010) ........................................... 14

Department of Homeland Security, *Privacy Impact Assessment for the TECS
System: CBP Primary and Secondary Processing* (Dec. 22, 2010) .................... 24

DHS, Privacy Impact Assessment for the Border Searches of Electronic Devices
(Aug. 25, 2009) ....................................................................... 21

EFF, *CBP Data Extraction Release* ....................................................... 18

Ericsson, *Ericsson Mobility Report* (June 2015) ...................................... 5

FBI, Federal Business Opportunities, *Notice of Intent to Sole Source*,
(Aug. 28, 2013) ....................................................................... 18

Fitbit, *Surge specs* ............................................................................. 7

Garmin, *Drive Product Line* ................................................................. 8

Google, *About Chromebook* ................................................................. 9

Google, *Maps* ................................................................................... 17

Letter from Shari Suzuki, Customs and Border Protection, to Mark Rumold,
Electronic Frontier Foundation (May 14, 2012) ............................... 18

Mint, *All in One* ............................................................................... 8

National Institute of Standards and Technology, Special Pub. 800-145, *The NIST Definition of Cloud Computing*, Special Publication (Sept. 2011) ........................ 8

Nest, Meet the Nest Cam Indoor Security Camera ..................................................... 8

Nissan, *NissanConnect Navigation System Features* ................................................ 8

Pew Research Center, *Mobile Technology Fact Sheet* ........................................ 5, 6

PwC Strategy&, *Connected Car Report 2016: Opportunities, Risk, and Turmoil on the Road to Autonomous Vehicles* (Sept. 28, 2016) ................... 8

Stephen Lawson, Future of Mobile Phones Is in the Cloud, Ex-Nokia CTO Says, InfoWorld (April 16, 2009) ..................................................................................... 9

U.S. Sentencing Commission, *Overview of Federal Criminal Cases Fiscal Year 2014* ........................................................................................................................ 26

Uber, *Getting a trip receipt* ..................................................................................... 9

*UFED Physical Analyzer* .......................................................................................... 17

*United States Attorney's Annual Statistical Report Fiscal Year 2014* ................... 26

WhatsApp, *Security* .................................................................................................. 9

# STATEMENT OF INTEREST[1]

*Amici curiae* Electronic Frontier Foundation,[2] Asian Americans Advancing

Justice-Asian Law Caucus,[3] Council on American-Islamic Relations (CAIR),[4]

CAIR California,[5] CAIR Florida, Inc.,[6] CAIR New York,[7] CAIR Ohio,[8] and The

National Association of Criminal Defense Lawyers[9] are nonprofit public interest

organizations that work to protect civil liberties. *Amici curiae* advocate for the

constitutional right to privacy, including at the U.S. border.

---

[1] No party's counsel authored this brief in whole or in part. Neither any party nor any party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than *amici*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief. The defendant consented and the government is not opposed to the filing of this brief.
[2] eff.org.
[3] advancingjustice-alc.org.
[4] cair.com.
[5] ca.cair.com.
[6] cairflorida.org.
[7] cair-ny.org.
[8] cairohio.com.
[9] nacdl.org.

# **INTRODUCTION**

The Fourth Amendment's border search exception, permitting warrantless and suspicionless "routine" searches of belongings and persons at the U.S. border, should not apply to digital devices like Ms. Molina-Isidoro's cell phone. All border searches of the data stored or accessible on digital devices—whether "manual" or "forensic"—are "non-routine" and thus fall outside the border search exception. This is because *any search* of digital data is a "highly intrusive" search that implicates the "dignity and privacy interests" of the traveler. *U.S. v. Flores-Montano*, 541 U.S. 149, 152 (2004). Under the Supreme Court's ruling in *Riley v. California,* 134 S. Ct. 2473 (2014), border agents should be required to obtain a probable cause warrant to search the data stored or accessible on a digital device.

The *Riley* Court presented an analytical framework that complements the border search doctrine's traditional consideration of whether a search is "routine" or "non-routine." The Court explained that, in determining whether to apply an existing exception to the warrant and probable cause requirements to a "particular category of effects" such as cell phones, individual privacy interests must be balanced against legitimate governmental interests. *Id.* at 2484. The government's interests are analyzed by considering whether a search conducted without a warrant and probable cause is sufficiently "tethered" to the purposes underlying the exception. *Id.* at 2485. In the case of digital data at the border, not only are

individual privacy interests at their highest in devices such as cell phones and laptops, searches of digital devices without a warrant and probable cause are not sufficiently "tethered" to the narrow purposes justifying the border search exception: immigration and customs enforcement.

However, even if such "tethering" may be considered sufficient—meaning that there is a clear nexus between enforcing the immigration and customs laws, and conducting searches of digital devices at the border without a warrant and probable cause—the extraordinary privacy interests that travelers have in their cell phones and laptops outweigh any legitimate governmental interests. Prior to the rise of mobile computing, the "amount of private information carried by international travelers was traditionally circumscribed by the size of the traveler's luggage or automobile." *U.S. v. Cotterman*, 709 F.3d 952, 964 (9th Cir. 2013) (en banc). Today, however, the "sum of an individual's private life" sits in the pocket or purse of any traveler carrying a cell phone, laptop or other digital device. *Riley*, 134 S. Ct. at 2489.

The district court below stated, "Were this Court free to decide this matter in the first instance, it might prefer that a warrant be required to search an individual's cell phone at the border." *U.S. v. Molina-Isidoro*, 2016 WL 8138926, *8 (W.D. Tex. Oct. 7, 2016) (citing *U.S. v. Caballero*, 178 F. Supp. 3d 1008, 1016-17 (S.D. Cal. 2016)). Yet the district court felt bound by Fifth Circuit precedent

and declined to apply *Riley* to the border context or even "to decide whether the search of an individual's cell phone is a routine or nonroutine border search." *Id.*

However, a "person's digital life ought not to be hijacked simply by crossing a border." *Cotterman*, 709 F.3d at 965. This Court should take the step that the district court felt it could not take. *Amici* urge this Court to hold that all border searches of the data stored or accessible on digital devices are "non-routine," and thus, consistent with *Riley*, a probable cause warrant is required.[10]

## ARGUMENT

### I.   Digital Devices Contain and Access Vast Amounts of Highly Personal Information

Before digital devices came along, border searches of personal property, like searches incident to arrest, were "limited by physical realities and tended as a general matter to constitute only a narrow intrusion on privacy." *Riley*, 134 S. Ct. at 2489. In *Riley*, the government argued that a search of cell phone data is the same as a search of physical items, and so a cell phone should fall within the search-incident-to-arrest exception, which would permit the warrantless and suspicionless search of an arrestee's cell phone. *Id.* at 2488. The Court rejected this

---

[10] After the district court opinion below, a separate panel of the Fifth Circuit issued an unpublished, *per curiam* opinion in *U.S. v. Escarcega*, 2017 WL 1380555 (5th Cir. 2017), upholding a warrantless border search of the defendant's cell phone. The court's one-page opinion did not address the facts and law set forth in this brief. *Amici* urge the present panel to conduct its own analysis of the Fourth Amendment's applicability to digital devices at the border.

argument: "That is like saying a ride on horseback is materially indistinguishable from a flight to the moon." *Id. See also U.S. v. Kim*, 103 F. Supp. 3d 32, 55 (D.D.C. 2015) (in a border search case, stating *Riley* "strongly indicate[d] that a digital data storage device cannot fairly be compared to an ordinary container when evaluating the privacy concerns involved"). The Court examined the nature of cell phones themselves—rather than how the devices are searched—and concluded they are "not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life.'" *Riley*, 134 S. Ct. at 2494-95 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)).

Most people carry portable digital devices. Cell phones in particular have become "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley*, 134 S. Ct. at 2484. Globally, there are 7.5 billion cell phone subscriptions, including 3.9 billion for a smartphone.[11] Ninety-five percent of American adults own a cell phone, with 77 percent owning a smartphone.[12] Additionally, 22 percent

---

[11] Ericsson, *Ericsson Mobility Report* (June 2017), https://www.ericsson.com/assets/local/mobility-report/documents/2017/ericsson-mobility-report-june-2017.pdf.

[12] Pew Research Center, *Mobile Technology Fact Sheet* (Jan. 12, 2017), http://www.pewinternet.org/fact-sheets/mobile-technology-fact-sheet/.

of American adults own an e-reader and 51 percent own a tablet computer.[13] As the

Supreme Court stated, "Prior to the digital age, people did not typically carry a

cache of sensitive personal information with them as they went about their day.

Now it is the person who is not carrying a cell phone, with all that it contains, who

is the exception." *Riley*, 134 S. Ct. at 2490.

Digital devices are both quantitatively and qualitatively different from

physical containers like luggage. *Id.* at 2489. Quantitatively, the vast amount of

personal data on digital devices at the border is the same as if "a person's suitcase

could reveal not only what the bag contained on the current trip, but everything it

had ever carried." *Cotterman*, 709 F.3d at 965. *See also U.S. v. Saboonchi*, 48

F.Supp.3d 815, 819 (*Saboonchi II*) (stating "the sheer quantity of information

available on a cell phone makes it unlike other objects to be searched"). With their

"immense storage capacity," cell phones, laptops, tablets and other digital devices

can contain the equivalent of "millions of pages of text, thousands of pictures, or

hundreds of videos." *Riley*, 134 S. Ct. at 2489. *See also Cotterman*, 709 F.3d at

964 ("The average 400-gigabyte laptop hard drive can store over 200 million

pages—the equivalent of five floors of a typical academic library.").

Qualitatively, digital devices "collect[] in one place many distinct types of

information … that reveal much more in combination than any isolated record."

---

[13] *Id.*

*Riley*, 134 S. Ct. at 2489. They "are simultaneously offices and personal diaries"

and "contain the most intimate details of our lives." *Cotterman*, 709 F.3d at 964.

"Even the most basic phones that sell for less than $20 might hold photographs,

picture messages, text messages, Internet browsing history, a calendar, a thousand-

entry phone book, and so on." *Riley*, 134 S. Ct. at 2489. Also, "[h]istoric location

information is a standard feature on many smartphones and can reconstruct

someone's specific movements down to the minute, not only around town but also

within a particular building." *Id.* at 2490 (citing *U.S. v. Jones*, 565 U.S. 400, 415

(2012) (Sotomayor, J., concurring) ("GPS monitoring generates a precise,

comprehensive record of a person's public movements that reflects a wealth of

detail about her familial, political, professional, religious, and sexual

associations.")).

Even digital devices with more limited features and storage capacity than

cell phones and laptop computers contain a wide variety of highly personal

information. Wearable fitness devices track a variety of data related to an

individual's health.[14] E-readers can reveal every book a person has read.[15]

---

[14] For example, FitBit's Surge records steps, distance, floors climbed, calories burned, active minutes, workouts, sports played, sleep, and heart rate. It also records non-health information including the user's GPS location, and call and text notifications. *See* Fitbit, *Surge specs*, *https*://www.fitbit.com/surge.

[15] For example, Amazon's Kindle "holds thousands of books" as well as personal documents. *See* Amazon, *Kindle compare*, http://www.amazon.com/dp/B00I15SB16/ref=nav_shopall_k_ki#kindle-compare.

Dedicated GPS devices, including car navigation systems, show where someone has traveled and store the addresses of personal associates or favorite destinations.[16]

Importantly, many digital devices, including Ms. Molina-Isidoro's cell phone, permit access to personal information stored in the "cloud"—that is, not on the devices themselves, but on servers accessible via the Internet.[17] Thus, border agents can get a comprehensive look at a traveler's financial life with smartphone or tablet applications ("apps") that link to bank, credit card, and retirement accounts, as well as monthly bills.[18] Or they can see inside a traveler's home via live video feeds provided by home security apps.[19] Some digital devices already

---

[16] *See, e.g.*, Garmin, *Drive Product Line*, http://www8.garmin.com/automotive/pdfs/drive.pdf; Nissan, *NissanConnect Navigation System Features*, https://www.nissanusa.com/connect/features-app/navigation-system. Additionally, the next generation of "connected cars"—with Internet access, and a variety of sensors and features—promise to be a treasure trove of data on drivers and their passengers. *See, e.g.,* PwC Strategy&, *Connected Car Report 2016: Opportunities, Risk, and Turmoil on the Road to Autonomous Vehicles* (Sept. 28, 2016), http://www.strategyand.pwc.com/reports/connected-car-2016-study.
[17] *See* National Institute of Standards and Technology, Special Pub. 800-145, *The NIST Definition of Cloud Computing* (Sept. 2011), http://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-145.pdf.
[18] *See, e.g.*, Mint, *All in One*, https://www.mint.com/how-mint-works.
[19] See, e.g., Nest, Meet the Nest Cam Indoor Security Camera, https://nest.com/camera/meet-nest-cam/.

store virtually all data in the cloud,[20] and some analysts predict this will become

ubiquitous.[21] Because cloud data can "appear as a seamless part of the digital

device when presented at the border," *Cotterman*, 709 F.3d at 965, border agents

"would not typically know whether the information they are viewing was stored

locally … or has been pulled from the cloud," *Riley*, 134 S. Ct. at 2491. In this

case, border agents accessed Ms. Molina-Isidoro's cloud data: they opened her

Uber and WhatsApp cell phone apps, which store user data remotely on the

companies' servers.[22] There is no indication that border agents put her phone in

airplane mode or otherwise disconnected it from the Internet when they accessed

these apps.[23]

---

[20] *See, e.g.*, Google, *About Chromebook* ("Gmail, Maps, Docs and pics [are] safely stored in the cloud, so a laptop spill really is just a laptop spill"), https://www.google.com/chromebook/about/.

[21] See, e.g., Stephen Lawson, Future of Mobile Phones Is in the Cloud, Ex-Nokia CTO Says, InfoWorld (April 16, 2009) ("The standard architecture that will realize the promise of mobile phones won't be hardware or software but a cloud-based platform…."), http://www.infoworld.com/article/2631862/mobile-apps/future-of-mobile-phones-is-in-the-cloud--ex-nokia-cto-says.html

[22] For example, if a phone is in airplane mode, the Uber app will not load the user's trip history stored on Uber's servers. *See generally* Uber, *Getting a trip receipt*, https://help.uber.com/h/846f6cad-6f27-492a-9e0b-d2f056e1298e. And while WhatsApp "doesn't store your messages on our servers once we deliver them," if the app is open and connected to the Internet, any new messages that are delivered are pulled from WhatsApp's servers. *See* WhatsApp, *Security*, https://www.whatsapp.com/security/.

[23] CBP recently announced that border agents may not access cloud data when searching a digital device. E.D. Cauchi, *Border Patrol Says It's Barred From Searching Cloud Data on Phones*, NBC News (July 12, 2017), http://www.nbcnews.com/news/us-news/border-patrol-says-it-s-barred-searching-

Therefore, today's digital devices enable the reconstruction of "the sum of an individual's private life" covering a lengthy amount of time—"back to the purchase of the [device], or even earlier." *Riley*, 134 S. Ct. at 2489. While people cannot physically "lug around every piece of mail they have received for the past several months, every picture they have taken, or every book or article they have read," they now do so digitally. *Id.* at 2489. *See also Cotterman*, 709 F.3d at 965 (stating "digital devices allow us to carry the very papers we once stored at home"). But it is not just that a phone "contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is." *Riley*, 134 S. Ct. at 2491.

In sum, portable digital devices differ wildly from luggage and other physical items a person possesses when entering or leaving the country. Now is the time to acknowledge the full force of the privacy implications of border searches of digital devices. As the Supreme Court said, "It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology." *Kyllo v. U.S.*, 533 U.S. 27, 33-34

cloud-data-phones-n782416. *Amici* are aware of no such policy at the time of the border search at issue here (July 2016). Indeed, media reports indicate that border agents commonly search cloud data when searching digital devices. EFF, *CBP Responds to Sen. Wyden: Border Agents May Not Search Travelers' Cloud Content* (July 17, 2017), https://www.eff.org/deeplinks/2017/07/cbp-responds-sen-wyden-border-agents-may-not-search-travelers-cloud-content.

(2001). Thus, "the rule we adopt must take account of more sophisticated systems that are already in use or in development." *Id.* at 36.

## II.   The Border Search Exception Is Narrow

"[T]he ultimate touchstone of the Fourth Amendment is reasonableness." *Riley*, 134 S. Ct. at 2482. Normally, reasonableness requires a warrant based on probable cause. *Id.* (citing *Vernonia School District 47J v. Acton*, 515 U.S. 646, 653 (1995)). However, *in limited circumstances*, neither a warrant nor probable cause is required when the "primary purpose" of a search is "beyond the normal need for law enforcement" or "beyond the general interest in crime control." *Vernonia*, 515 U.S. at 653; *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 48 (2000). Crucially, searches without a warrant and probable cause (including *suspicionless* searches) under these limited exceptions must be "tethered" to the purposes justifying the exception. *Riley*, 134 S. Ct. at 2485 (citing *Arizona v. Gant*, 556 U.S. 332, 343 (2009)). *See also Florida v. Royer*, 460 U.S. 491, 500 (1983) (warrantless searches "must be limited in scope to that which is justified by the particular purposes served by the exception").

The search-incident-to-arrest exception at issue in *Riley* is not justified by the need to gather additional evidence of the alleged crime, but instead the need to protect officer safety and prevent the destruction of evidence. *Riley*, 134 S. Ct. at 2483 (citing *Chimel v. California*, 395 U.S. 752 (1969)). The warrantless and

suspicionless drug tests at issue in *Vernonia* were upheld as reasonable to protect the health and safety of minor student athletes. 515 U.S. at 665. Warrantless and suspicionless sobriety checkpoints are reasonable because they advance the non-criminal purpose of roadway safety. *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444 (1990). By contrast, the warrantless and suspicionless vehicle checkpoint in *Edmond* to uncover illegal narcotics was unconstitutional because its primary purpose was to "uncover evidence of ordinary criminal wrongdoing." *Edmond*, 531 U.S. at 42.

The border search exception permits warrantless and suspicionless "routine" searches of individuals and items in their possession when crossing the U.S. border. *U.S. v. Montoya de Hernandez*, 473 U.S. 531 (1985). *Edmond* clarified that although some exceptions, like border searches, might involve law enforcement activities because they can result in "arrests and criminal prosecutions," that does not mean that the exceptions were "designed primarily to serve the general interest in crime control." 531 U.S. at 42. Rather, the border search exception is intended to serve the narrow purposes of enforcing the immigration and customs laws. *See Cotterman*, 709 F.3d at 956 (emphasizing the "narrow" scope of the border search exception).

In 1925, the Supreme Court articulated these two limited justifications for warrantless and suspicionless searches at the border: "Travelers may be so stopped

- 12 -

in crossing an international boundary because of national self-protection

reasonably requiring one entering the country to identify [i] himself as *entitled* to

come in, and [ii] his belongings as effects which may be *lawfully* brought in."

*Carroll v. U.S.*, 267 U.S. 132, 154 (1925) (emphasis added). *Carroll* relied on

*Boyd*, which drew a clear distinction between searches and seizures consistent with

the purposes of the border search exception—in particular, enforcing customs

laws—and those to obtain evidence for a criminal case:

> The search for and seizure of … goods liable to duties and concealed
> to avoid the payment thereof, are totally different things from a search
> for and seizure of a man's private books and papers for the purpose of
> obtaining information therein contained, or of using them as evidence
> against him.

116 U.S. at 623.

Accordingly, under the immigration and customs rationales, the border

search exception permits warrantless and suspicionless "routine" searches in order

to prevent undocumented immigrants from entering the country, *Almeida-Sanchez

v. U.S.*, 413 U.S. 266, 272 (1973), and to enforce the laws regulating the

importation or exportation of goods, including ensuring that duties are paid on

those goods, *Boyd*, 116 U.S. at 624. The border search exception may also be

invoked to prevent the importation of contraband such as drugs, weapons,

agricultural products, and other items that could harm individuals or industries if

brought into the country. *See Montoya de Hernandez*, 473 U.S. at 537 (discussing

"the collection of duties and … prevent[ing] the introduction of contraband into this country").[24]

While the Supreme Court in *U.S. v. Ramsey* stated that "searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border," 431 U.S. 606, 616 (1977), the Court's reliance on *Boyd* and *Carroll* shows that the Court understood that this government power must remain tethered to the specific and narrow purposes of enforcing the immigration and customs laws. *Id.* at 617-19. This parallels both *Chimel* and *Riley*, which held that searches of a home and cell phone data, respectively, were outside the scope of the narrow purposes of the search-incident-to-arrest exception. *See Riley*, 134 S. Ct. at 2483 (citing *Chimel*, 395 U.S. at 753-54, 762-63).

Therefore, it is not "anything goes" at the border. *U.S. v. Seljan*, 547 F.3d 993, 1000 (9th Cir. 2008) (en banc). Rather, the Fourth Amendment requires that border searches without a warrant and probable cause must be "tethered" to

---

[24] *See also* Chad Haddal, Cong. Research Serv., 7-5700, *Border Security: Key Agencies and Their Missions*, 2 (Jan. 26, 2010) ("CRS Report") ("CBP's mission is to prevent terrorists and terrorist weapons from entering the country, provide security at U.S. borders and ports of entry, apprehend illegal immigrants, stem the flow of illegal drugs, and protect American agricultural and economic interests from harmful pests and diseases."), https://www.fas.org/sgp/crs/homesec/RS21899.pdf.

enforcing the immigration and customs laws.

### III. All Border Searches of Digital Data, Whether "Manual" or "Forensic," are Highly Intrusive of Personal Privacy and Are Thus "Non-Routine"

Not all border searches are "routine." In *Ramsey*, the Supreme Court made clear that the Constitution restricts the border search exception: "The border-search exception is grounded in the recognized right of the sovereign to control, *subject to substantive limitations imposed by the Constitution*, who and what may enter the country." 431 U.S. at 620 (emphasis added). The Court has defined "non-routine" border searches as "highly intrusive" or those that impact the "dignity and privacy interests" of travelers, *Flores-Montano*, 541 U.S. at 152, or are carried out in a "particularly offensive manner," *Ramsey*, 431 U.S. at 618 n.13. Thus, in *Montoya de Hernandez*, the Supreme Court held that detaining a traveler until she defecated to see if she was smuggling drugs in her digestive tract was a "non-routine" seizure and search that required reasonable suspicion. 473 U.S. at 541.

Some courts have concluded that only "forensic" searches of digital data are "non-routine" (and thus require reasonable suspicion), while "manual" searches of the same data are "routine" and fall within the border search exception. *See, e.g.*, *Cotterman*, 709 F.3d at 967-68; *U.S. v. Kolsuz*, 185 F.Supp.3d 843, 858 (E.D. Va. 2016); *U.S. v. Saboonchi*, 990 F.Supp.2d 536, 547-48 (D. Md. 2014) (*Saboonchi I*). In this case, the district court acknowledged *Riley*'s conclusion that "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated

by the search of a … wallet, or a purse." *Molina-Isidoro*, 2016 WL 8138926, *at* \*4.

Unfortunately, the district court declined "to decide whether the search of an

individual's cell phone is a routine or nonroutine border search." *Id.* at \*8.

However, *any* search of the data stored or accessible on a digital device—

whether manually or with specialized "forensic" tools—is a "highly intrusive"

search that implicates the "dignity and privacy interests" of the traveler, or may be

considered "particularly offensive," and thus is "non-routine." *Flores-Montano*,

541 U.S. at 152.

Given the vast amount of highly personal information that digital devices

contain, as well as their ability to connect to sensitive data in the cloud, "manual"

searches of digital devices at the border greatly burden privacy interests in ways

that searches of luggage do not. *See Saboonchi I*, 990 F.Supp.2d at 547

(acknowledging that "a conventional computer search can be deeply probing").

"Manual" searches of digital data can access emails, voicemails, text messages,

call logs, contact lists, photographs, videos, calendar entries, shopping lists,

personal notes, and web browsing history, as well as cloud data via apps. While the

search of Ms. Molina-Isidoro's cell phone was "manual," it focused on her

WhatsApp and Uber apps, both of which can connect to data stored in the cloud.

*Molina-Isidoro*, 2016 WL 8138926, *at* \*2. Even a history of a traveler's physical

location may be uncovered through a "manual" search: for example, on an iPhone,

a user may have toggled on the "Frequent Locations" feature.[25] Or, if a traveler uses Google Maps while logged into their Google account, a "manual" search of the app would reveal the traveler's navigation history.[26] As the cost of storage drops and technology advances, digital devices will hold ever greater amounts of personal information and feature increasingly powerful search capabilities.[27] Thus, "manual" searches will reveal ever more personal information, making the distinction between them and "forensic" searches even more meaningless.

Additionally, new technology enables border agents to quickly conduct "forensic" searches at the border itself. This empowers the government to invade the digital privacy of ever growing numbers of travelers. For example, Cellebrite manufactures several Universal Forensic Extraction Devices ("UFEDs") that plug into cell phones, laptops, tablets and other mobile devices and enable the quick and easy extraction of detailed digital data.[28] UFEDs also enable access to social media accounts and other cloud content, which the company describes as "a virtual

---

[25] To change iOS 10 settings go to Settings>Privacy>Location Services>System Services>Frequent Locations.

[26] *See* Google, *Maps*, https://www.google.com/maps/.

[27] Apple's iPhone currently has a search function for the entire phone that pulls content based on keywords. Apple, *Use Search on Your iPhone, iPad, or iPod Touch*, https://support.apple.com/en-us/HT201285.

[28] *See* Cellebrite, *Mobile Forensics Products*, http://www.cellebrite.com/Mobile-Forensics/Products; Cellebrite, *UFED Physical Analyzer*, http://www.cellebrite.com/Mobile-Forensics/Applications/ufed-physical-analyzer; Cellebrite, *iOS Forensics: Physical Extraction, Decoding and Analysis From iOS Devices*, http://www.cellebrite.com/Pages/ios-forensics-physical-extraction-decoding-and-analysis-from-ios-devices.

goldmine of potential evidence for forensic investigators."[29] UFEDs are small and

portable, enabling "simple, real-time extractions onsite."[30] A UFED can extract

eight gigabytes of data from an Apple iPhone in a "mere 20 minutes," while its

search functions cut the search time "from days to minutes."[31] CBP is already

using UFEDs.[32] In training materials, the agency lauds the devices' portability and

ease of use in the field, stressing that no computer is needed to extract data like call

logs, videos, pictures, and text messages.[33] The FBI also uses UFEDs and prefers

this technology due to its "extraction speed and intuitive user interface."[34]

Thus, the rapid rate of technological change belies any suggestion, based on

---

[29] Cellebrite, *UFED Cloud Analyzer*, http://www.cellebrite.com/Mobile-Forensics/Products/ufed-cloud-analyzer.

[30] Cellebrite, *Unlock Digital Intelligence*, 3 (2015), http://www.cellebrite.com/Media/Default/Files/Forensics/Solution-Briefs/Mobile-Forensics-Solution-Brief.pdf.

[31] Cellebrite, *Case Study: Cellebrite Certification Training Helps NY Agency Maximize UFED Usage*, 1, http://www.cellebrite.com/Media/Default/Files/Forensics/Case-Studies/Cellebrite-Certification-Training-Helps-NY-Agency-Maximize-UFED-Usage_Case%20Study.pdf.

[32] CBP, Federal Business Opportunities, *UFED Kits, Software Updates* (Sept. 4, 2013), https://www.fbo.gov/index?s=opportunity&mode=form&tab=core&id=44c0118f0eea7370c6eb1d5a8bf711d7; Letter from Shari Suzuki, CBP, to Mark Rumold, EFF (May 14, 2012), https://www.eff.org/files/filenode/foia__20120808155244.pdf,

[33] EFF, *CBP Data Extraction Release*, 31, 33, https://www.eff.org/document/cbp-data-extraction-release.

[34] FBI, Federal Business Opportunities, *Notice of Intent to Sole Source* (Aug. 28, 2013), https://www.fbo.gov/index?s=opportunity&mode=form&id=e3742ca87da9650f719e902f86ad36b6&tab=core&_cview=0.

much more primitive technology, that "[c]ustoms agents have neither the time nor the resources to search the contents of every computer." *U.S. v. Ickes*, 393 F.3d 501, 507 (4th Cir. 2005). As the Ninth Circuit noted, "It is the *potential* unfettered dragnet effect that is troublesome." *Cotterman*, 709 F.3d at 966 (emphasis added).

Therefore, the dichotomy between "manual" and "forensic" searches is factually meaningless and constitutionally unworkable. Constitutional rights should not turn on such a flimsy distinction. *See Kim*, 103 F. Supp. 3d at 55 (stating that whether the border search of the defendant's laptop was reasonable does not "turn on the application of an undefined term like 'forensic'"). Importantly, *Riley* did not distinguish between how digital devices are searched. Even though the searches in *Riley* were *manual* searches (like the search of Ms. Molina-Isidoro's cell phone), the Court required a probable cause warrant for *all searches* of a cell phone seized incident to an arrest. *Riley*, 134 S. Ct. at 2480-81, 2493.

In sum, all searches of digital data at the border are "non-routine" and thus fall outside the border search exception because the government's conduct is the same: accessing to an unprecedented degree tremendous amounts of highly personal information. *See Flores-Montano*, 541 U.S. at 154 n.2 ("We again leave open the question 'whether, and under what circumstances, a border search might be deemed 'unreasonable' because of the particularly offensive manner in which it

is carried out.'").

## IV.    A Probable Cause Warrant Should Be Required for Border Searches of Data Stored or Accessible on Digital Devices

The Supreme Court prefers "clear guidance" and "categorical rules." *Riley*, 134 S. Ct. at 2491. The *Riley* Court's analytical framework complements the border search doctrine's traditional consideration of whether a search is "routine" or "non-routine." In determining whether to apply an existing exception to the warrant and probable cause requirements to a "particular category of effects," individual privacy interests must be balanced against legitimate governmental interests. *Riley*, 134 S. Ct. at 2484. In the case of border searches of digital devices, this balancing clearly tips in favor of the traveler. Given that *Ramsey* noted the similarity between the border search exception and the search-incident-to-arrest exception, 431 U.S. at 621, this Court should adopt the clear rule that *all* border searches of data stored or accessible on digital devices are "non-routine" searches that require a probable cause warrant.[35]

Border agents may still benefit from the border search exception: for example, they can search without a warrant or individualized suspicion the

---

[35] While the Supreme Court's border search cases have not required more than reasonable suspicion for "non-routine" searches, the Court has never said that reasonable suspicion is the absolute upper limit for searches conducted at the border. *See, e.g.*, *Montoya de Hernandez* 473 U.S. at 541 n.4 ("[W]e suggest no view on what level of suspicion, if any, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches.").

"physical aspects" of a digital device to ensure that it does not contain contraband such as drugs or explosives. *See Riley*, 134 S. Ct. at 2485. Moreover, any concerns that a warrant is difficult to obtain at the border should be allayed given that "[r]ecent technological advances … have … made the process of obtaining a warrant itself more efficient." *Riley*, 134 S. Ct. at 2493.[36]

## A.    A Probable Cause Warrant Should Be Required Given the Highly Personal Information Stored and Accessible on Digital Devices

Modern digital devices like cell phones and laptops reveal the "sum of an individual's private life," *Riley*, 134 S. Ct. at 2489, making any search by the government an unprecedented intrusion into individual privacy. Any border search of a digital device is highly intrusive and "bears little resemblance" to searches of travelers' luggage. *Id.* at 2485. Even DHS acknowledges that "a search of [a] laptop increases the possibility of privacy risks due to the vast amount of information potentially available on electronic devices."[37]

The fact that luggage may contain physical items with personal information does not negate the unique privacy interests in digital devices. A few letters in a suitcase do not compare to the detailed record of correspondence over months or

---

[36] Border agents clearly have the ability to seek and obtain judicial authorization for "non-routine" searches and seizures. *See, e.g., Montoya de Hernandez*, 473 U.S. at 535 ("[C]ustoms officials sought a court order authorizing a pregnancy test, an [x-ray], and a rectal examination.").

[37] DHS, Privacy Impact Assessment for the Border Searches of Electronic Devices, 2 (Aug. 25, 2009), http://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_cbp_laptop.pdf.

years that a digital device may contain and even a "manual" search would reveal.

Also, paper diaries do not have a keyword search function and people do not carry

all the diaries they have ever owned when they travel. The *Riley* Court stated:

> [T]he fact that a search in the pre-digital era could have turned up a photograph or two in a wallet does not justify a search of thousands of photos in a digital gallery. The fact that someone could have tucked a paper bank statement in a pocket does not justify a search of every bank statement from the last five years. And to make matters worse, such an analogue test would allow law enforcement to search a range of items contained on a phone, even though people would be unlikely to carry such a variety of information in physical form.

134 S. Ct. at 2493.

The district court acknowledged *Riley*'s conclusion that "[m]odern cell

phones, as a category, implicate privacy concerns far beyond those implicated by

the search of a … wallet, or a purse." *Molina-Isidoro*, 2016 WL 8138926, *at* *4.

Thus, the district court stated, "Were this Court free to decide this matter in the

first instance, it might prefer that a warrant be required to search an individual's

cell phone at the border." *Id.* at *8.

Nevertheless, the district court, feeling constrained by Fifth Circuit

precedent, stated that it would require no more than reasonable suspicion at the

border. *Id.* at *6. However, the reasonable suspicion standard insufficiently

protects Fourth Amendment rights in this context. The proper level of

constitutional protection is a probable cause warrant.

**B.** **A Probable Cause Warrant Should Be Required Because Searching Digital Data Is Not Tethered to the Narrow Purposes of the Border Search Exception**

Under the *Riley* balancing test, the government's interests are analyzed by considering whether a search conducted without a warrant or probable cause is "tethered" to the purposes underlying the exception. 134 S. Ct. at 2485. In the case of digital data at the border, searches of digital devices without a warrant and probable cause are not sufficiently "tethered" to the narrow purposes justifying the border search exception: immigration and customs enforcement. As with the search-incident-to-arrest exception, the border search exception might "strike[] the appropriate balance in the context of physical objects," but its underlying rationales do not have "much force with respect to digital content on cell phones" or other digital devices. *Id.* at 2484 (citing *U.S. v. Robinson*, 414 U.S. 218 (1973)).

In creating the categorical rule that the search-incident-to-arrest exception does not extend to digital devices like cell phones, the *Riley* Court found that searches without a warrant and probable cause of data on digital devices seized following an arrest are not sufficiently "tethered" to the narrow purposes of the search-incident-to-arrest exception: to protect officers from an arrestee who might grab a weapon, and to prevent the arrestee from destroying evidence. *Id.* at 2483, 2485-86. The Court stated that "data on the phone can endanger no one," and the probabilities are small that associates of the arrestee will remotely delete digital

data or that an officer will discover an unlocked phone in time to thwart a password lock or encryption. *Id.* at 2485-88. The Court concluded that neither "problem is prevalent," and therefore their possibilities do not justify embodying such a significant privacy invasion within a categorical rule—that is, permitting a warrantless search of a cell phone *for every arrest. Id.*

Likewise, searches of digital devices at the border without a warrant and probable cause are not sufficiently "tethered" to the narrow purposes of enforcing the immigration and customs laws.

Border agents determine a traveler's immigration status and authority to enter the United States, not by inspecting the personal data on a digital device, but rather by inspecting official documents such as a passport or visa, and by consulting government databases that contain additional information such as outstanding arrest warrants and watchlist designations.[38]

Border agents enforce customs laws by interviewing travelers, examining their luggage or vehicles, and if necessary, their persons. The traditional purpose of the customs rationale of the border search exception is to prevent physical items from entering (or leaving) the country at the moment the traveler crosses the

---

[38] *See* CRS Report at 2 ("CBP inspectors enforce immigration law by examining and verifying the travel documents of incoming international travelers to ensure they have a legal right to enter the country."); DHS, *Privacy Impact Assessment for the TECS System: CBP Primary and Secondary Processing,* 8 (Dec. 22, 2010), http://www.dhs.gov/xlibrary/assets/privacy/privacy-pia-cbp-tecs.pdf.

border, typically because the items were not properly declared for duties, or are contraband that could harm individuals or industries if brought into the country. Just as the *Riley* Court stated that "data on the phone can endanger no one," 134 S. Ct. at 2485, physical items cannot be hidden in digital data.

In this case, Ms. Molina-Isidoro is being prosecuted for attempting to import methamphetamine into the country. *Molina-Isidoro*, 2016 WL 8138926, *2. While drugs are physical items that were, in fact, found in Ms. Molina-Isidoro's luggage, a warrantless search of Ms. Molina-Isidoro's cell phone is not sufficiently "tethered" to enforcing laws against importing illegal drugs. As the district court stated, a warrantless search of "the contents of a cell phone does not seem to directly contribute to [one] justification for the border search exception—i.e., preventing the entry of unwanted illicit substances into the country." *Id.* at *8, n.10. *See also Kolsuz*, 185 F. Supp. 3d at 858 (stating that digital data "is merely indirect evidence of the things an individual seeks to export illegally—not the things themselves—and therefore the government's interest in obtaining this information is less significant than the government's interest in directly discovering the items to be exported illegally," and "any digital information contained on a cell phone that is relevant to exporting goods illegally can be easily obtained once a border agent establishes some level of individualized suspicion").

Some digital content, such as child pornography, may be considered "digital

contraband" that may be interdicted at the U.S. border. *Cf. U.S. v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 376–77 (1971) ("Congress may declare [obscenity] contraband and prohibit its importation."). However, the government has not demonstrated that "digital contraband"—unlike illegal drugs, for example—is a significant or "prevalent" problem *at the border* that justifies a *categorical rule* generally permitting border searches of digital devices absent a warrant and probable cause.[39] As the Ninth Circuit said, "legitimate concerns about child pornography do not justify unfettered crime-fighting searches or an unregulated assault on citizens' private information." *Cotterman*, 709 F.3d at 966.

Ultimately, even if "tethering" may be considered sufficient—meaning that there is a clear nexus between enforcing the immigration and customs laws, and conducting searches of digital devices at the border without a warrant and probable cause—the extraordinary privacy interests that travelers have in their cell phones and laptops still outweigh any legitimate governmental interests. Governmental

---

[39] Of the 56,218 criminal cases filed in federal court in the 2014 fiscal year, only 102 or 0.2 percent involved customs violations. *See* DOJ, *United States Attorney's Annual Statistical Report Fiscal Year 2014* 11-12, http://www.justice.gov/sites/default/files/usao/pages/attachments/2015/03/23/14sta trpt.pdf. In the 2014 fiscal year, child pornography made up only 2.5 percent of all federal "offenders" prosecuted and sentenced in federal court. *See* U.S. Sentencing Commission, *Overview of Federal Criminal Cases Fiscal Year 2014* 2 (Aug. 2015), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2015/FY14_Overview_Federal_Criminal_Cases.pdf. This represents *all* child pornography offenders, not just those apprehended at the border.

interests do "not justify dispensing with the warrant requirement across the board." *Riley*, 134 S. Ct. at 2486. "The Supreme Court has never endorsed the proposition that the goal of deterring illegal contraband at the border suffices to justify any manner of intrusive search." *Cotterman*, 709 F.3d at 967.

## CONCLUSION

This Court should adopt the categorical rule that all border searches of data stored or accessible on digital devices are "non-routine," and thus, consistent with *Riley v. California*, a probable cause warrant is required.

Dated: August 28, 2017

Respectfully submitted,

/s/ *Mitchell L. Stoltz*
Mitchell L. Stoltz
   *Counsel of Record*
Sophia Cope
Adam Schwartz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
(415) 436-9333
mitch@eff.org

*Counsel for Amici Curiae*
*EFF, AAAJ-ALC, CAIR,*
*and four CAIR Chapters*

Nicole DeBorde
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
712 Main Street, Suite 2400
Houston, TX 77002
(713) 526-6300

*Counsel for Amicus Curiae*
*National Association of Criminal*
*Defense Lawyers*

Cynthia Orr
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
Goldstein, Goldstein, Hilly & Orr
310 S. St. Mary's Street
29th Floor Tower Life Building
San Antonio, TX 78205
(210) 226-1463

*Counsel for Amicus Curiae National
Association of Criminal Defense
Lawyers*

Michelle Simpson Tuegel
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
Hunt & Tuegel PLLC
ALICO Building, Suite 1208
425 Austin Avenue
Waco, TX 76703
(254) 753-3738

*Counsel for Amicus Curiae National
Association of Criminal Defense
Lawyers*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(A)(7)(C)**

I hereby certify as follows:

1.      The foregoing Brief of *Amici Curiae* complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  The brief is printed in proportionally spaced 14-point type, and there are 6,311 words in the brief according to the word count of the word-processing system used to prepare the brief (excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)).

2.      The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and with the type style requirements of Fed. R. App. P. 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Mac 2011 in 14-point Times New Roman font.

Dated:   August 28, 2017           /s/ *Mitchell L. Stoltz*
                                   Mitchell L. Stoltz

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeal for the Fifth Circuit by using the appellate CM/ECF System on August 28, 2017. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:   August 28, 2017

/s/ *Mitchell L. Stoltz*
Mitchell L. Stoltz